641 F.2d 117
 Allen Bodine SCOTT, by and through his Guardian, Michael J. Weintraub.
v.
Dr. Ingre Rudolph PLANTE; Commissioner of Institutions and
Agencies, Ann Klein; Medical Director of New Jersey State
Hospital, New Jersey Mental Health Commissioner, Dr. Martin
Weinberg; State of New Jersey, Brendan T. Byrne, Governor;
Supreme Court of New Jersey, Richard J. Hughes, Chief Justice.
Appeal of Allen B. SCOTT,
Appeal of Dr. Ingre Rudolph PLANTE et al.
 Nos. 80-1314, 80-1315 and 80-1596.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 18, 1980.
Decided Feb. 5, 1981.
Rehearing and Rehearing En Banc Denied March 6, 1981.
As Amended March 9, 1981.
 
 Michael J. Weintraub (argued), Steven L. Friedman, Weintraub & Gelade, Trenton, N. J., for Allen Bodine Scott.
 John J. Degnan, Atty. Gen. of N. J., Stephen Skillman, Asst. Atty. Gen., Steve Wallach, Deputy Atty. Gen. (argued), Trenton, N. J., for Dr. Ingre Rudolph Plante, Ann Klein and Dr. Martin Weinberg.
 Before GIBBONS, WEIS and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Allen Bodine Scott appeals, and certain defendants cross-appeal, from a final judgment which disposed of all Scott's claims after trial of his numerous complaints charging violations of his civil rights. Several of those claims were submitted to a jury, which returned a verdict in his favor on two of them and in favor of the defendants on one. On a post-trial motion the district court granted partial relief from the verdicts in Scott's favor. Those claims that were not submitted to the jury were tried to the court, which denied all requests for injunctive, declaratory and habeas corpus relief. What remains is a judgment on the jury verdict of one dollar nominal damages for violation of Scott's constitutional rights. We vacate and remand for further proceedings consistent with this opinion.
 
 I.
 
 2
 Scott has been involuntarily confined to the Vroom Building, a maximum security section of the Trenton State Psychiatric Hospital, for approximately 25 years. In 1954 he was indicted by a grand jury in Burlington County, New Jersey, for the murder of his grandmother. In February 1955 a hearing was held in Burlington County in which a jury determined that he was mentally incompetent to stand trial, and an order was entered that he be removed from the County Jail and confined to Trenton State Hospital "until such time as he may be restored to reason, but not to be released from such confinement except on the order of this court."[1] Scott was placed in the Vroom Building, where he has remained continuously, except for brief periods when he was returned to Burlington County to stand trial on the indictment. No trial ever took place. On October 7, 1968 the indictment was dismissed on the ground that Scott was insane when the offense was committed. Upon the dismissal of the indictment he was returned to Trenton State Hospital "until the further order of (the Burlington County) Court."[2]
 
 
 3
 In July of 1973 Scott filed in the District Court the first of a series of pro se complaints addressed to the fact and conditions of his confinement in the Vroom Building. By December 30, 1974 five such complaints had been filed. Scott repeatedly requested appointment of counsel pursuant to 28 U.S.C. § 1915(d), but all such requests were denied. Early in 1975 all his complaints were summarily dismissed, and Scott appealed. We granted a motion for a certificate of probable cause, 28 U.S.C. § 2253, and appointed counsel. In Scott v. Plante, 532 F.2d 939 (3d Cir. 1976), we reversed. Reviewing his complaints and the pleadings and affidavits on file, we discerned five separate claims:
 
 
 4
 1. That he had been subjected to the involuntary administration of psychotherapeutic substances, 532 F.2d at 945;
 
 
 5
 2. that he was being confined to the Vroom Building without treatment, 532 F.2d at 947;
 
 
 6
 3. that the physical conditions at the Vroom Building subjected him to violations of federally protected rights, 532 F.2d at 947;
 
 
 7
 4. that his confinement in the Vroom Building after the dismissal of the indictment was unconstitutional, 532 F.2d at 948; and
 
 
 8
 5. that the procedures by which New Jersey determined from time to time that his confinement must continue did not meet minimum federal due process requirements. 532 F.2d at 949.
 
 
 9
 We held that the district court erred in granting summary judgment on Scott's involuntary medication claims, and in granting a Rule 12(b)(6) dismissal on each of the remaining claims. In remanding for further proceedings we suggested that his request for the appointment of counsel pursuant to 28 U.S.C. § 1915(d) be given serious consideration. 532 F.2d at 950.
 
 II.
 
 10
 This court's judgment reversing dismissal of Scott's complaints was received by the District Court on April 21, 1976. On August 17, 1976 the court appointed Michael J. Weintraub, Esq. to represent him. Scott was dissatisfied with this appointment, and moved that the court dismiss Mr. Weintraub, and appoint instead David Ferleger, Esq. of the Mental Patient Civil Liberties Project in Philadelphia. On September 2, 1976 that motion was denied. No progress was made in disposing of the case for a considerable period. Meanwhile Scott filed pro se applications for interim relief in the form of the appointment of a manager to run Trenton State Hospital and stop the abuses of which he complained, and for a change of venue. On November 21, 1977 an order was entered:
 
 
 11
 1. Michael J. Weintraub, Esq., of 227 East Hanover St., Trenton, N.J. 08608 is appointed as guardian ad litem for the plaintiff, Allen Bodine Scott, for these consolidated actions, and is to serve in that capacity as well as his attorney.
 
 
 12
 2. The stay of these consolidated proceedings pending appointment of a guardian ad litem is vacated.
 
 
 13
 3. The requirement that a single amended complaint be prepared and filed is vacated, but without precluding the taking of that step at or before entry of pretrial order.
 
 
 14
 4. The consolidated cases will be reinstated to the active civil calendar.
 
 
 15
 The order is unusual in several respects. First, there is nothing of record disclosing by what procedure or on what authority the court acted in appointing a guardian ad litem.[3] Second, there is no record of any order staying the proceedings pending such an appointment. Third, there is no record of an order requiring the filing of a single amended complaint. However, the absence of significant docket entries between September 2, 1976 and November 21, 1977 suggests that some action was taken by the court to stay the cases for reasons unknown.
 
 
 16
 On January 25, 1978 Michael J. Weintraub filed an amended complaint, bearing the docket numbers of the five consolidated cases which were before us on Scott's prior appeal. The prayers for relief of the amended complaint are quoted in the margin.[4] The factual allegations, while more concisely and artfully set out, preserve all the claims which we previously considered. The prayers for relief included virtually all modes of relief which it is within the power of the court to grant to the plaintiff. An answer was filed on behalf of all defendants on February 23, 1978. Thereafter on March 13, 1978 the court filed a memorandum and order granting leave to file an amended complaint. The memorandum and order refer to a prior order directing that an amended complaint be filed, and to an order vacating the order, neither of which appear of record. The memorandum also refers to another Scott complaint, No. 78-2367, in which he seeks habeas corpus relief, and directs that it be consolidated with the five cases we had previously consolidated. An order to that effect was entered on October 3, 1978, and the defendants' answer to the complaint in No. 78-2367 was filed seven days later. On October 18, 1978, thirty months after our mandate was received by the district court, a status conference was held. There is no record of what transpired at this conference. Nothing more transpired about scheduling the cases for trial until February 15, 1979, when the district judge to whom it was assigned sent a memorandum to Mr. Weintraub, and to the District Court clerk, but not to the Attorney General who was representing the defendants, asking to be advised "as to necessary time for final trial preparation so date can be set." Meanwhile Scott sent to this court and to other places a number of letters asking for disposition of his case. Finally, on April 23, 1979 an order was entered by the Chief Judge of the District Court reassigning the case to himself and reallocating the place of trial from Newark to Trenton. Chief Judge Fisher promptly scheduled a trial date and issued a writ of habeas corpus ad testificandum for Scott's appearance. The trial commenced on May 31, 1979, 37 months after the date our mandate reached the district court, and 58 months after Scott first sought relief in the district court.
 
 III.
 
 17
 At the trial Scott testified and also presented the testimony of Dr. Robert Sadoff, a psychiatrist, and 58 exhibits. The exhibits were for the most part excerpts from the records about his condition and treatment maintained by Trenton Psychiatric Hospital during the course of his stay. Others dealt with the physical condition of the Vroom Building. Still others were written complaints by Scott and by his mother to various state officials, including defendants, respecting his treatment and the conditions he was being subjected to.
 
 
 18
 At the end of the plaintiff's case the court, on motion by the Attorney General, dismissed the State of New Jersey as a defendant, ruling that it was not a "person" subject to suit under 42 U.S.C. § 1983. The court also dismissed as defendants Governor Brendan T. Byrne, on the grounds that there was no evidence he either participated in or knew of and allowed continuance of any wrong to Scott, and the Chief Justice and members of the Supreme Court of New Jersey, because "I can't tell the Supreme Court to enforce their rules...." (Transcript, June 6, 1979, at 44). Motions to dismiss were rejected as to the remaining defendants. Dr. Ingre R. Plante and Dr. Martin Weinberg, who each held the positions of Chief Executive Officer and Medical Director of Trenton Psychiatric Hospital, and Ann Klein, State Commissioner of the Department of Institutions and Agencies, of which Trenton Psychiatric Hospital is a part.[5] The court also dismissed all of Scott's state law claims, which included false imprisonment, assault and battery, and malpractice. Neither the transcript nor the court's post-trial opinion discloses whether the state law claims were dismissed for failure of proof or as a matter of discretion with respect to the exercise of pendent jurisdiction. The effect of these rulings was to dismiss the State, the Governor, and the Supreme Court of New Jersey not only on the damage claims which were going to the jury, but also on any claims for injunctive or declaratory relief on either state or federal grounds. Dismissal of the pendent state law claims also withdrew from the case any possibility of an award of money damages or injunctive or declaratory relief on those claims.
 
 
 19
 The defendants' case included the testimony of Harvey Musikoff, Acting Chief Executive Officer of Trenton Psychiatric Hospital, who was from October 1977 to April 1978 Chief of the Forensic Section of that hospital, contained in the Vroom Building. Dr. Musikoff holds a Ph. D. in rehabilitation counseling and has taught forensic psychology. While he was on the stand five packets of hospital records, Exhibits D-1 through D-4 and Exhibit D-8, were marked in evidence, comprising all records relating to Scott for his entire stay in Vroom. The defendants also introduced Exhibit D-5, a group of documents dealing with requests to the Governor and the Legislature for additional funding for the Vroom Building over the past four or five years. Finally Exhibits D-6 and D-7 included various New Jersey State court orders dealing with Scott's confinement. The defendants presented no medical testimony. None of the three defendants left in the case testified. Instead, at the close of Dr. Musikoff's testimony they renewed their motion to dismiss the complaint. The court denied that motion.
 
 IV.
 
 20
 Only the claims for money damages were submitted to the jury. Those were submitted in the form of special verdict interrogatories to which the defendants made no objection. The interrogatories and the jury's answers are as follows:
 
 
 21
 1. Was the plaintiff deprived of adequate
 treatment while at Trenton
 State Hospital Forensic Unit? Yes
2. If the answer to No. 1 is "yes", was
 that deprivation the proximate cause
 of injury and damage to plaintiff? Yes
3. Was plaintiff forced to undergo
 harmful or painful modes of
 treatment over his refusal? No
4. If the answer to No. 3 is "yes", was
 it the proximate cause of injury and
 damage to plaintiff?
5. Were the physical conditions at the
 Vroom Building such as to amount
 to a deprivation of due process? Yes
6. If the answer to No. 5 is "yes", was
 it the proximate cause of injury and
 damage to plaintiff? Yes
7. Do you find liability as to any of the
 following defendants? Yes
 Ingre R. Plante, M.D. Yes
 Ann Klein Yes
 Martin Weinberg, M.D. Yes
8. Compensatory Damages $15,000.
 Punitive Damages $10,000.
 
 
 22
 Thus the case was, with the defendants' apparent acquiescence, submitted on three separate theories, against three separate defendants, but with a request for a single verdict on compensatory damages and a single verdict on punitive damages. It appears, therefore, that the jury found the defendants jointly and severally liable for compensatory and punitive damages. The special verdict interrogatories predicate liability on deprivation of adequate treatment and on deprivation of due process with respect to the conditions of incarceration in the Vroom Building, but do not separate the damages among the two bases of recovery. Since the defendants did not in the trial court object to the form of the interrogatories either before or after the verdict, and do not on appeal argue that they were prejudiced by the way the questions were formulated, we must read them in a manner which reconciles them with the jurors' probable intention in light of the Court's instructions. Cf. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); Barnhart v. Dollar Rent A Car Systems, Inc., 595 F.2d 914, 917 (3d Cir. 1979) (resolution of facially inconsistent answers to special interrogatories).
 
 
 23
 In its instruction to the jury the court observed:
 
 
 24
 [T]he plaintiff breaks his claims against defendant(s) down to three categories: First, the right to treatment, secondly, the right to refuse treatment and thirdly, that the conditions of the Vroom Building, that is as you have heard them, were a violation of his Constitutional rights to due process.
 
 
 25
 The jury's verdict was adverse to Scott on the alleged violation of a right to refuse treatment, and he does not on appeal raise any question about that verdict. Thus we are concerned only with his right to receive treatment and his condition of confinement claims.
 
 
 26
 On the right to treatment claim the Court charged:
 
 
 27
 Now, while the plaintiff was confined to Trenton State Hospital, Forensic Unit thereof, which you have heard so much about, he had a right to adequate medical treatment. This right arose from the 14th Amendment of the United States Constitution which provides no State shall deprive any person of life, liberty or property without due process of law. Plaintiff was committed because he was dangerous to himself and to others. That is in the first instance. Remember, he has never been convicted of a crime. In exchange for his commitment which society was entitled to, the State owed plaintiff adequate medical treatment. You, the jury, must decide whether plaintiff received the treatment which was owed.
 
 
 28
 Although the defendants contended in the trial court, and contend here, that an involuntarily committed patient has no federally protected right to treatment, they made no objection to the quoted portion of the charge; in particular, they made no request for a more specific definition of adequate treatment, and made no objection to the language "he had a right to adequate medical treatment." In Romeo v. Youngberg, 644 F.2d 147 (3d Cir. 1980) (en banc) we held that the involuntarily committed mentally retarded have a constitutionally protected right to treatment, and the analysis of that case is for fourteenth amendment purposes equally applicable to the involuntarily committed mentally ill. Id., at 168 n.53. Thus we have rejected the defendants' basic position that there is no federally protected right to treatment. The quoted portion of the charge is less complete with respect to such a right than the one which in Romeo v. Youngberg, supra, we held to be appropriate,[6] but no more specific charge was requested and no objection was made. The charge informed the jury, correctly, that Scott, as a patient involuntarily committed for mental illness, had a right to treatment, and the verdict reflects the jury's conclusion that he was deprived of that right.
 
 
 29
 As to the conditions of confinement, the Court charged:Now ... (Scott) also contends that the conditions at the Vroom building amounted to punishment without due process of law and violation of the Civil Rights Act.
 
 
 30
 You have heard evidence which described the conditions of the Vroom building in which plaintiff has been confined for 24 years. You must remember that at no time was plaintiff convicted of a crime. Therefore, I Charge you that the State could not Constitutionally punish him. You must determine whether the conditions existing in the Vroom building amounted to punishment.
 
 
 31
 Not every disability or loss of liberty which plaintiff has experienced is punishment. You must remember that the State originally saw fit to confine him because he was deemed to be dangerous but unable to stand trial. Loss of some freedom of choice and privacy are inherent in confinement and do not rise to the level of punishment, and the fact that detention interfered with the plaintiff's desire to live as comfortably as possible and with as little restraint as possible did not mean that he was being punished. A number of factors should guide your decision of whether plaintiff was being punished.
 
 
 32
 Were the conditions and disabilities of Vroom imposed by officials for the purpose of punishment? If not, then is the condition which you are considering reasonably related to a legitimate government objective, or is it arbitrary or purposeless? Besides the State's objective of keeping a dangerous individual off the streets, you should realize that the government has a legitimate interest that stem (sic) from it's (sic) need to manage the facility in which plaintiff was detained. These governmental interests include the maintenance of security and order at the institution. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, amount to punishment. However, if the conditions or restraints are excessive in relation to the State's non-punitive purpose, you may find they constituted punishment.
 
 
 33
 This charge gives meaning to the jury's answer to interrogatory No. 5. That affirmative answer establishes that the jury concluded that Scott, who has not been convicted of a crime, has been confined in the extremely harsh restrictive conditions of the Vroom Building for reasons not related to legitimate government objectives, i. e., as punishment. Defendants did not object to this portion of the trial instructions, and none of their requests to charge are inconsistent with it.
 
 
 34
 Having charged the jury that Scott had a right to treatment and a right to be free from punishment, the court turned to the issue of personal responsibility. In that respect the Court charged:
 
 
 35
 If you decide that plaintiff was given adequate treatment, you need decide no more. But if you find his treatment was inadequate, you must next determine whether either Ann Klein, Dr. Ingre Rudolph Plante, or Dr. Martin Weinberg were responsible for the denial of treatment.
 
 
 36
 Since Ann Klein was not involved with the day-to-day running of the institution, you obviously won't be able to find that she actually participated or acquiesced in any denial of treatment. She can only be liable if you find that she had actual knowledge of the Vroom building's inadequate treatment of the plaintiff, while having the power to authorize or implement better care for him. You could find this knowledge, not only by direct evidence, but also by proof, that defendant Klein normally exercised reasonably close supervision over the defendants personally charged with the plaintiff's care and that those defendant's (sic) acts or omissions were open and not surreptitious.
 
 
 37
 With respect to Doctors Plante and Weinberg, you could apply the same test in determining whether they had actual knowledge to (sic) the inadequacies of plaintiff's treatment and also, had the resources in (sic) authority to remedy the situation.
 
 
 38
 Plante and/or Weinberg might also be liable for their actual participation in a denial of plaintiff's rights by denying him a right to treatment. You must decide whether either of those two doctors actually was engaged in a course of conduct calculated to deny plaintiff his right to treatment.
 
 
 39
 The defendants did not object to this portion of the charge. They did, however, request a charge on vicarious liability, and urge as error the Court's failure to give it.[7] The charge as given, however, is substantially as requested and accords with the standard for personal liability in § 1983 actions set forth in Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976). The charge on personal responsibility deals specifically only with failure to treat Scott. Defendants made no objection, however, to the court's failure to relate that portion of its instruction to the unlawful punishment claim, and made no request for a charge addressed to that issue.
 
 
 40
 Finally the Court turned to the issue of official immunity, charging:
 
 
 41
 Now, the defendants in this case are All State Executive Branch officials. They claim that they are immune from having to respond in money damages to plaintiff's claim. This claim of immunity is offered as a defense to plaintiff's claim and the officials have the burden of convincing you by a preponderance of the evidence that immunity should attach.
 
 
 42
 There are two components to the immunity defense. Keep in mind also, that plaintiff has a number of claims which you must keep distinct for purposes of applying the defense.
 
 
 43
 If you find that plaintiff was subjected to punishment without due process, you must decide which of the defendants, if any, knew or should have known of plaintiff's right to be free from punishment and if they knew or should have known that their conduct or omission would or did violate the law. The foregoing inquiry is relevant only to the issue of punishment through conditions.
 
 
 44
 The immunity defense would be unavailable to defendants on all plaintiff's claims, right to treatment, right to refuse treatment and punishment, if you find that any of the defendants acted or failed to act with malicious intention to deprive the plaintiff of a right or to cause him other injury. For the purpose of determining whether any defendant possessed malice, you must decide whether or not he intended the consequences of his conduct or omission.
 
 
 45
 The charge as given was not objected to. It must, however, be contrasted with several instructions requested by the defendants. Most of them were properly rejected because they were framed in such a manner as to place the burden of offering evidence and of persuasion on the plaintiff. We have held that qualified immunity is a defense on which the defendants have the burden of proof. Skehan v. Bloomsburg State Teachers College, 590 F.2d 470 (3d Cir. 1978), cert. denied, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979).
 
 
 46
 One request, however, is worthy of note. The defendants asked for a charge:
 
 
 47
 Monetary damages can only be assessed against a defendant if he or she "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of (plaintiff), or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to (plaintiff)....
 
 
 48
 "For purposes of this question, an official has, of course, no duty to anticipate constitutional developments." O'Connor v. Donaldson, 422 U.S. 563, 577, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396 (1975).
 
 
 49
 The defendants contend that the charge as given fails to comply with O'Connor v. Donaldson's "two-step test for official immunity" (Appellee's Brief 3-D), although their brief does not elaborate. The charge as given provided, with respect to all of plaintiff's claims, that the immunity defense "would be unavailable to the defendants ... if you find that any of the defendants acted or failed to act with malicious intention to deprive him of a right, or to cause him other injury." The negative implication of the language seems to be that absent malice the defense is available. As to the lesser standard, "that he knew or should have known", the court applied that standard only to the punishment claim. The court's intention seems to have been to require a finding of malice to overcome the immunity defense on the right to treatment claim, while requiring a finding either of malice or of knowing disregard of a known constitutional right with respect to the punishment claim. Such a distinction would be entirely consistent with the position of the defendants, pressed both in the district court and here, that the law with respect to a constitutional right of the involuntarily committed to treatment was highly unsettled. See Reese v. Nelson, 598 F.2d 822, 826 (3d Cir. 1979). A fair reading of the charge, then, seems to be that it required a finding of qualified immunity on the right to treatment claim unless malice were shown. This was more than the defendants sought in the quoted request to charge, and on this record possibly more than defendants were entitled to. That this may have been their contemporaneous understanding is confirmed by their failure to object when given an opportunity to do so at the close of the court's instructions. If there was ambiguity in the manner in which the court articulated the immunity charge it could not ordinarly be considered now, for "(n)o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51; see Fisher v. Volz, 496 F.2d 333, 348 (3d Cir. 1974).[8]
 
 V.
 
 50
 Thus the legal standards which the court below used to instruct the jury and assess plaintiff's equitable claims were substantially correct. Resolution of the remaining questions on appeal depends on whether the law was correctly applied to the particular facts of this case.
 
 
 51
 We turn first to Scott's appeal from the judgment dismissing all requests for injunctive, declaratory, and habeas corpus relief. We believe that in two respects the trial court erred in denying equitable relief.
 
 A. Conditions of Confinement
 
 52
 The jury found, and the court agreed, that confining Scott in the maximum security wing of Trenton Psychiatric Hospital amounted to punishment in violation of the due process clause. There was ample evidence that Scott and the other inmates were exposed for twenty four years to subhuman living conditions, including poor plumbing with leaking pipes covering the floor with inches of water; inoperative sinks and toilets; inadequate ventilation; absence of windows or inoperative windows; inability during seven months of the year to go into the yard for fresh air; inoperative radiators resulting in indoor temperatures below 50o ; summer temperatures reading 105o due to absence of ventilating equipment; for a time availability of showers only once a week; and absence of hot running water in sinks in the cells. As to many of these gross physical deficiencies the testimony was not even disputed. The record discloses no treatment or security reason for subjecting Scott and the other inmates to such severe deprivations. To the contrary, there was evidence in the form of hospital records suggesting that Scott has neither engaged in violent behavior nor been a management problem. Indeed, a 1971 report by a Dr. Folmer of the hospital staff recommends that he be placed in a civil ward because of his cooperative behavior. Nevertheless, he remained through trial (and is to date) confined to a prison wing of the hospital which includes sentenced inmates suffering severe mental illnesses.
 
 
 53
 In the face of such harsh confinement, Scott petitioned for complete release, or, in the alternative, for transfer from the prison wing to a civil ward. The court concluded that the relief of complete release from custody was not, in Scott's present condition, appropriate. That finding is not clearly erroneous. At a minimum, however, this record required that the court make findings of fact as to whether Scott could be housed in surroundings less restrictive of his personal liberty. Courts have a duty to guard against unnecessary personal restraints not only at the confinement stage.[9] As one court has observed, "It makes little sense to guard zealously against the possibility of unwarranted deprivations prior to hospitalization only to abandon the watch once the patient disappears behind hospital doors." Covington v. Harris, 419 F.2d 617, 623-24 (D.C.Cir.1969). In that case, a plaintiff, whose circumstances closely resembled Scott's,[10] was granted a hearing at which the hospital was required to demonstrate that it had considered alternative security accommodations for appellant and to explain why it had found them inadequate. We find Scott is entitled to the same.[11]
 
 
 54
 Precedent in this Circuit supports this conclusion. In Romeo v. Youngberg, supra, we held:
 
 
 55
 The basis of Romeo's first claim, that he was unduly shackled, is clearly inimical to the right of an unconvicted citizen to be free from punishment. Shackling may not be punishment per se, but it raises a presumption of a punitive sanction. It squarely collides with a traditional liberty interest in freedom from bodily restraint. A valid involuntary commitment ex necessitate extinguishes a retired person's right to freedom from any type of confinement. Nevertheless, a residuum of liberty remains which is entitled to due process protection.
 
 
 56
 At 159. After Romeo shackling may be justified only by a "compelling necessity" or by showing that it was "the least restrictive method of dealing with the patient in light of his problems and the surrounding environment." At 161. That holding applies, as well, to Scott.[12] Although Scott was not shackled, the severe restrictions on movement and deprivations of sanitary, healthful conditions experienced by inmates in the Vroom Building qualitatively resemble shackling, and so likewise raise "a presumption of a punitive sanction." Our decision in Romeo acknowledged as much[13] and indicated that the judicial restraint perhaps appropriate to consideration of inadequate treatment claims should not apply when courts are asked to judge alternative environmental dispositions within the institution. At 160 n.24 & 168 n.55. Although the assignment of a patient to the maximum security wing of a hospital may involve the exercise of medical prognosis, just as the choice of treatment does, the court has a greater obligation to review constraints involuntarily imposed than it does treatments a state offers to willing patients. Cf. at 165 (limits placed on state's power to impose drastic treatments without patient's consent). Moreover, whereas courts may lack the resources or inclination to evaluate day-to-day therapeutic prescriptions, they are well suited to examine a discrete long-term state action such as the fact and conditions of Scott's confinement in the Vroom Building. Cf. Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 102 (3d Cir. 1979), cert. granted, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980) (Congressional mandate to courts to enforce least restrictive standards for personal liberty under Developmentally Disabled Assistance and Bill of Rights Act). Any reservations over applying least restrictive analysis to the conditions of temporary detainment[14] must yield when the deprivation of liberty can last as long as 24 years or more.
 
 
 57
 Scott was therefore entitled to have the court below carefully consider his petition for transfer from the maximum-security pavillion to a civil psychiatric wing of the hospital. Before denying the request, the court must be satisfied that hospital officials have considered the existing alternative residences and found that no less restrictive setting would be sufficient to secure adequate protection from threatened harm.[15] The district court's opinion below contains no findings that the subhuman conditions at the Vroom Building were necessary to the state's legitimate interest in protection,[16] or that Scott's placement in other, less restrictive surroundings available at Trenton Psychiatric Hospital was ever tried or considered and found unworkable. To the contrary, there are strong indications in the record that he could be moved to a civil ward where his liberty would be less restrained and his surroundings would be more comfortable.[17]
 
 
 58
 The fashioning of an appropriate decree respecting Scott's future custody is a matter which should be addressed by the trial court in the first instance. But even if it is determined that no place but the Vroom Building is secure enough to house Scott, specific relief from its intolerable physical conditions should be ordered. They are not justified by a "compelling necessity" related to the purposes of confinement. Instead, they are at best the result of insufficient funding, which Romeo held was not an adequate excuse. At 161.[18]
 
 B. Adequate Treatment
 
 59
 The jury also found, and the court agreed, that Scott has been unconstitutionally denied treatment. Scott's own testimony, that of his expert, Dr. Sadoff, and the hospital records reveal that no staff member worked with plaintiff individually on a regular basis; that neither a psychiatrist nor a psychologist has seen him individually on any regular basis in the twenty four years of his confinement; that ten years after his confinement a staff physician filed a report that there was no reason to bother trying to treat him; that recently a treatment team was established, but it met with him for only ten to fifteen minutes a month;[19] and finally, that he had not received any psychiatric counseling for almost a year and a half prior to trial. Indeed, it is undisputed that Trenton Psychiatric Hospital lost its hospital accreditation several years ago partly because the treatment offered its inmates was merely custodial and not therapeutic.
 
 
 60
 The court denied prospective relief, however, noting:
 
 
 61
 Although he must be accorded all possible consideration and treatment, plaintiff's medical future cannot be directed through this court, but must depend upon the determination of experts as to his individual requirements and needs. I am satisfied from the information provided at the motion hearing in September that definitive steps have been taken and will continue in order to rectify any deficiencies in that regard.
 
 
 62
 Memorandum at 10. This is not a satisfactory disposition of Scott's claim for injunctive relief with respect to lack of treatment. It is of course the case that his medical future must depend upon medical judgment as to his individual requirements and needs. Halderman v. Pennhurst State School & Hospital, 612 F.2d 84, 114 (3d Cir. 1979), cert. granted, --- U.S. ----, 100 S.Ct. 2984, 66 L.Ed.2d ---- (1980). But he has been substantially without the benefit of such medical assistance for 24 years, he has been in court seeking it since 1973, and even today the State's brief contends that he is not constitutionally entitled to it. The court refers to definitive steps already taken, but there is nothing of record disclosing what those steps are or what assurance there is that they will continue. Scott contends, and we agree, that he is entitled to the protection of a specific injunction.
 
 
 63
 Scott also contends (1) that the trial court erred in denying his habeas corpus petition to be released completely from custody; (2) that the court erred in denying relief respecting a law library in the Vroom Building. The court's findings of fact on these claims are not clearly erroneous and denial of relief with respect to them was a permissible exercise of discretion. Finally, Scott contends that the court erred in entering judgment in favor of Governor Brendan T. Byrne and the Justices of the New Jersey Supreme Court. There is no evidentiary basis for any damage claim against these defendants, and they do not appear to be necessary parties for the equitable relief we have held should be considered.
 
 VI.
 
 64
 In response to special interrogatories, the jury returned verdicts in favor of Scott as to both the treatment and punishment claims, on the basis of which they awarded both compensatory and punitive damages. Defendants Plante, Klein and Weinberg filed a motion for judgment notwithstanding the verdict or alternatively for a new trial. We must depend on the trial court's recital of the grounds for this motion for it is among the docketed pleadings which in the certified record are "missing." The court treated the motions separately and in considering the motion for judgment notwithstanding the verdict dealt separately with the claims for punitive and for compensatory damages.
 
 A.
 
 65
 Despite the motion for judgment notwithstanding the verdict, the compensatory award was upheld on several grounds. First, the court denied the motion as to the verdict on the treatment claim. Appealing from that denial, defendants urge that as a matter of law a person confined because he is a danger to self or others has no constitutional right to any treatment. That contention lacks merit. Had Scott been at large he might have been in a position to seek the treatment which would alleviate his mental illness. As we have held in Romeo v. Youngberg, supra, the state may not both deprive him of the liberty to seek treatment and of the treatment as well.
 
 
 66
 The right to treatment or habilitation in the case of the mentally retarded arises when an individual is involuntarily committed, regardless of whether parens patriae or police power grounds provide the major premise for the confinement.
 
 
 67
 Romeo v. Youngberg, supra, at 165; accord, Eckerhart v. Hensley, 475 F.Supp. 908, 915 (W.D.Mo.1979).
 
 
 68
 The defendants also contend that as a matter of law they were entitled to judgment notwithstanding the verdict by virtue of the eleventh amendment, since they were acting in official capacities as state officers. That contention is frivolous. Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824).
 
 
 69
 Defendants also urge that they should have been granted judgment notwithstanding the verdict because there is no evidentiary basis for the verdict that they personally violated Scott's rights. In that respect we must examine separately the treatment claim and the punishment claim.
 
 
 70
 In discussing the propriety of injunctive relief in Part V, we reviewed the evidence indicating that Scott's right to treatment had been violated. In addition to the testimony and hospital records, from which the jury could have found an absence of adequate treatment, there was the opinion of Dr. Sadoff that Scott's chances of improvement were probably diminished by the lack of treatment in the early stages of his institutionalization. Even the one witness presented by the defendants, Dr. Musikoff, conceded that earlier treatment might have led to improvement. Moreover, there was evidence from which the jury could have found that the individual defendants were personally responsible for the lack of treatment or aware of it and in a position to remedy that lack. Such knowledge could be inferred from the fact that the inadequacies of treatment which eventually resulted in loss of accreditation in 1977 must have been apparent long before that time to these defendants. Also, the jury could find that in addition to receiving complaints from Scott, Commissioner Klein and Dr. Weinberg made occasional on-site inspections of the Vroom Building. Dr. Weinberg even sat in on group treatment sessions which Scott attended and was quoted in his affidavit as saying that he was familiar with Scott's treatment in his role as plaintiff's custodian.
 
 
 71
 On the basis of this record, the trial court was thus correct to conclude that a judgment notwithstanding the verdict for lack of evidentiary support on the treatment claim would be improper. Although the jury was told to consider the case against each defendant separately, no provision was made for a discrete assessment of damages against each based upon their individual acts. Once again, since the point was not raised by the defendants, it must be deemed to have been waived.
 
 
 72
 As to the punishment claim, there was likewise ample evidence reviewed in Part V that the subhuman living conditions at the maximum security prison wing to which Scott has been confined amounted to punishment. As noted with respect to the discussion of the treatment claim, the jury could find that the defendants knew of his complaints, of the availability of alternative environments, and of their own power to arrange for them. The jury could have found that there was no treatment or security reason for subjecting Scott to such severe deprivations, in which event, the trial judge instructed the jury they were to find the defendants liable. Therefore, the evidence was sufficient to support the jury's finding that Scott's confinement was unconstitutional under the lenient rationality standard charged by the trial judge, let alone under the "compelling necessity" standard we adopted in Romeo v. Youngberg, supra.
 
 
 73
 Finally, defendants also contend that their motion for judgment notwithstanding the verdict should have been granted because they were entitled to a directed verdict that they were covered by official immunity. The trial court, rejecting that contention, observed:
 
 
 74
 The good faith immunity argued by defendants is qualified in nature and not absolute in a § 1983 action. The charge properly placed the burden of persuasion for this defense upon the defendants ... and it was fully within the province of the jury to reject it as they did in making a compensatory award.
 
 
 75
 Memorandum at 4. We agree. In reviewing a motion for judgment notwithstanding the verdict, we must determine, without weighing the credibility of the evidence, and giving Scott, who secured the jury verdict, the benefit of all reasonable inferences that can be drawn from that evidence, whether reasonable minds could not come to a different conclusion. See Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1177-80 (3d Cir. 1976), and cases cited. The right to have facts found by a jury, guaranteed by the Seventh Amendment, applies no less to civil rights actions than to conventional tort cases.
 
 
 76
 Reviewing the record in light of the foregoing strict standard, we cannot say the jury was compelled to find that defendants had established their requisite good faith. First, we note that the violations for which they were found liable are not acts of negligence. Punitive conditions or the absence of any treatment become constitutional violations because the justifications put forward by the state are not compelling.[20] The substance of the violation does not necessarily indicate the individual defendants' state of mind at the time the acts occurred or the reasonableness of their legal position, which, together, are the focus of inquiry for official immunity purposes. Pertinent to that inquiry was testimony from which the jury could have inferred that defendants withheld treatment, despite recognition that institutionalization without such treatment tends to deepen a patient's mental incapacity. Under such circumstances the jury might conclude that the defendants knowingly caused injury to Scott and, therefore, could not in good faith have believed they were acting within the law. Indeed, there was evidence that the defendants acted in disregard of the New Jersey law governing their institution and entitling its patients to adequate treatment and habitation.[21] It was harder still for official immunity to overcome the punishment claim, given that the right of citizens even in institutions to be free from inhumane conditions has long been undisputed. See Scott v. Plante, 532 F.2d 939 (3d Cir. 1976).
 
 
 77
 If defendants' position is that they innocently misconceived the law or had found it unsettled, they should have supplied evidence to that effect at trial. The risk of non-persuasion with regard to the qualified immunity defense is placed squarely on the defendants. Skehan v. Bloomsburg State Teachers College, supra. Yet none of the named defendants in this case even appeared to testify. The testimony of Dr. Musikoff does not touch on the beliefs of the defendants in the reasonableness of their respective courses of conduct, or on their knowledge of the governing legal standard. Indeed, the record contains no evidence suggesting that the right to treatment or to be free from punishment was in their mind unsettled. Dr. Musikoff's evidence touches only slightly on the tardy efforts, if any, defendants took to improve Scott's treatment or the conditions of his confinement beginning in 1977. Evidence of budgetary appeals by defendants in recent years to improve treatment and conditions at Vroom Building was certainly admissible, but evidence of their good faith with regard to the institutional population as a whole does not resolve as a matter of law the issue of their good faith towards the individual plaintiff in this case, whose specific plight the jury could have found was utterly ignored. On this record the jury certainly could conclude, as it obviously did, that defendants failed to carry their burden of proof on the good faith immunity defense.
 
 B.
 
 78
 The trial court granted the defendants' motion for judgment notwithstanding the verdict on the claim for punitive damages. Scott appeals from that order. As in the previous discussion of such motions on the liability claims, we must avoid weighing the credibility of the evidence and must give Scott, who secured the jury verdict, the benefit of all reasonable inference that can be drawn from that evidence. The standard is the same as that for the grant of a directed verdict, and in reviewing the record we owe no particular deference to the trial court's determination, but must make our own. See Fireman's Fund Ins. Co. v. Videfreeze Corp., supra, 540 at 1177-80.
 
 
 79
 In addition, we must be mindful of the legal standards governing the award of punitive damages in § 1983 actions. The award of punitive damages is authorized by that aspect of the law of torts having to do with admonition rather than compensation. Such an award punishes wrongdoing beyond the requirements of compensation both as a discouragement of private retribution and as a deterrent against future misconduct. The admonitory standard requires that the factfinder determine that the defendants "acted with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so...." Cochetti v. Desmond, 572 F.2d 102, 106 (3d Cir. 1978). Moreover,
 
 
 80
 ... although punitive damages are not a favorite of the law and are to be allowed only within narrow limits,
 
 
 81
 (t)he allowance of such damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore, the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of fact.
 
 
 82
 Fisher v. Volz, 496 F.2d 333, 347 (3d Cir. 1974), quoting Lee v. Southern Home Sites Corporation, 429 F.2d 290, 294 (5th Cir. 1970).
 
 
 83
 Mindful of these principles, we nonetheless confess to uneasiness about imposing exemplary damages against these defendants based on the existing record. We note, for example, Commissioner Klein's efforts albeit unsuccessful to get money from the legislature for upgrading the Vroom Building. In light of these efforts, we believe an inference of malice or wantonness must be based on more than her specific awareness of Scott's plight derived from two letters, both of which she forwarded to appropriate subordinates. This is not to say that the record conclusively vindicates the Commissioner's role in this case. When the evidence is simply too sparse to determine the punitive damages issue one way or another, and plaintiff bears the burden of proving malice or wantonness, Cochetti v. Desmond, supra,[22] perhaps a jury award of punitive damages cannot stand.
 
 
 84
 However, the insufficiency of the evidence on this issue warrants close examination, since the circumstances of this case are somewhat unusual. We traced earlier in Part II, the sluggish treatment of plaintiff's case which eventually required reassignment of the case to Newark from Trenton and prompted quick assignment of a trial date. This unorthodox course of events may explain why no pretrial conference was held, far enough in advance of trial to assist the parties in preparing their case. Realizing for the first time at trial the importance of demonstrating Commissioner Klein's personal responsibility and obtaining subjective evidence, plaintiff's counsel at that time served a subpoena on the Commissioner in order to obtain her testimony. Despite plaintiff's protestations, the trial court quashed the subpoena. That ruling no doubt hampered plaintiff's ability to carry his burden of proof on the issue of punitive damages.
 
 
 85
 We need not decide then whether the lower court's direction of judgment notwithstanding the verdict was valid on the existing record. Even when such a motion is granted, if the insufficiency of evidence is attributable to trial error, the defendants are not entitled to judgment notwithstanding the verdict and the appellate court can order a new trial. See Derr v. Safeway Stores, 404 F.2d 634 (10th Cir. 1968); 9 Wright & Miller, Federal Practice & Procedure § 2540 at 614 (1971); Fed.R.Civ.P. 50(c)(2), Notes of Advisory Committee at 100. We note, too that the Federal Rules permit a trial judge to order a new trial sua sponte within ten days of granting a judgment n. o. v., if he believes it is necessary to ensure substantial justice to the verdict- winner. Fed.R.Civ.P. 59(d). An appellate court should likewise be able to exercise such discretion, especially where as here there existed an alternative motion for a new trial, on which the lower court did not rule, despite the direction in Fed.R.Civ.P. 50(c)(1) to do so.
 
 
 86
 We conclude then that the issue of punitive damages in this case can only be properly resolved by a new trial, thereby affording plaintiff a more meaningful opportunity to prepare his case against Klein and the other individual defendants through interrogatories or depositions. The court of appeals has broad discretion to grant a new trial as to all or some issues. Heckman v. Federal Press Co., 587 F.2d 612, 619 (3d Cir. 1978). In that case, we emphasized the general rule stated by the Supreme Court:
 
 
 87
 Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.
 
 
 88
 Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). We are not convinced that complete separation of the damage and liability considerations in this case is possible; therefore we conclude that the better course would be to have all plaintiff's claims for legal relief submitted to the jury on retrial.
 
 VII.
 
 89
 Advancing an alternative motion for a new trial under Fed.R.Civ.P. 59, the defendants urged in the trial court that the liability verdict should be set aside because the verdicts were against the weight of the evidence. The trial court rejected both contentions. In light of our foregoing conclusion that a new trial is necessary on all legal claims, we need not review those decisions.
 
 
 90
 On damages, however, acting on defendants' new trial motion, the court took an action which was beyond its powers; lest the error recur on remand, we take this opportunity to address it. Concluding that the compensatory damage award of $15,000 exceeded the amount that a jury could properly award, the trial court reduced the award to one dollar. The court did so without affording the plaintiff the option of accepting a remittitur or a new trial. In a case where the facts as to damage are in dispute, the court may not do this without violating the Seventh Amendment. Kennon v. Gilmer, 131 U.S. 22, 9 S.Ct. 696, 33 L.Ed. 110 (1889); 6A Moore's Federal Practice P 59.05(3) at 59-61 (2d ed. 1979). This is not a case, such as Garfield Aniline Works v. Zendle, 43 F.2d 537, 538 (3d Cir. 1930), in which the amount of damage is a matter of undisputed calculation. Thus the court's decision to set aside the verdict and enter judgment for one dollar cannot stand.
 
 
 91
 Moreover, we have serious questions about the court's view of the evidence of damage. The court's charge properly instructed the jury that Scott could in a Section 1983 action recover for "any pain, suffering and mental anguish already suffered by him and proximately resulting from the injury in question." If the jury concluded, as apparently it did, that Scott had been confined unnecessarily in the harsh conditions of the Vroom Building, it certainly could infer that he suffered pain and mental anguish. See, e. g., Buise v. Hudkins, 584 F.2d 223 (7th Cir. 1978), cert. denied, 440 U.S. 916 (1979) (prisoner entitled to more than nominal damages in view of less desirable living conditions at prison than at farm); Mack v. Johnson, 430 F.Supp. 1139 (E.D.Pa.1977), aff'd 582 F.2d 1275 (3d Cir. 1978) (prisoner confined in segregation cell for 30 days compensated for deprivation of exercise and presumed mental anguish); Wright v. McMann, 321 F.Supp. 127 (N.D.N.Y.1970), aff'd in relevant part, 460 F.2d 126 (2d Cir. 1972) ($1500 award to compensate prisoner for being confined nude in isolation). Where the fact of injury appears but damages are not susceptible of mathematical calculation, the court should not ordinarily disturb the jury's evaluation of an appropriate compensatory award. Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1279 n.19 (3d Cir. 1979).
 
 
 92
 We do note, however, that the court was requested by defendants to charge that Scott not be compensated for damages due to lack of treatment for periods during which he refused a particular form of treatment. See O'Connor v. Donaldson, 422 U.S. 563, 569 n.4, 95 S.Ct. 2486, 2490 n.4, 45 L.Ed.2d 396 (1975). Although this failure to charge might not, alone, have warranted a new trial, the court will have an opportunity to consider this request more carefully on remand. Moreover, the court was requested to charge that damages could be awarded only for the period within the statute of limitations. The failure to give such a charge permitted the jury to assess damages from the time the plaintiff was first confined in 1954. We find no express ruling on this request and since it was not briefed, we do not pass on its merits. See generally Rosenau v. City of New Brunswick, 51 N.J. 130, 238 A.2d 169 (1968); Stanley Development Co. v. Millburn Tp., 26 N.J.Super. 328, 97 A.2d 743 (1954); cf. Stuebig v. Hammel, 446 F.Supp. 31 (M.D.Pa.1977) (Pennsylvania law).
 
 VIII.
 
 93
 One remaining issue, not raised in Scott's brief, must, because of our disposition of this appeal, be adverted to. At the end of the plaintiff's case the court dismissed the State of New Jersey as a defendant. At that time the court did not have the benefit of the Supreme Court's opinions in Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) and Maher v. Gagne, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). In remanding the case, however, we note the likelihood, if not the certainty, that Scott will apply for an award of attorney's fees pursuant to 42 U.S.C. § 1988, thus directly implicating Maher. To avoid prolonging this protracted litigation any more than necessary, we believe it appropriate to point out, in light of the recent Supreme Court rulings and the facts of this case, that the State's presence as a defendant for purposes of awarding such counsel fees may be important. The judgment is not yet final. On remand, therefore, the court below may upon proper motion by the plaintiff reconsider its judgment dismissing the State as a party and determine whether it is an appropriate defendant against which an award of attorney's fees might be made insofar as prospective injunctive relief is to be granted against the individual defendants in their official capacity.IX.
 
 
 94
 The judgment in defendants' favor on Scott's claims for prospective relief will be vacated and the case remanded for consideration of specific equitable relief in light of Scott's right to be given adequate treatment and have his assignment to other less restrictive settings within Trenton Psychiatric Hospital carefully considered. With respect to the liability of the individual defendants for compensatory and punitive damages, the judgments below are vacated and the case remanded with direction to grant a new trial on these issues in light of this opinion.
 
 
 
 [1]
 The hearing was held pursuant to N.J.S.A. 2A:163-2 (repealed 1978), which read in relevant part:
 If any person in confinement under commitment, indictment or under any process, shall appear to be insane, the assignment judge, or judge of the county court of the county in which such person is confined may, ... institute an inquiry and take proofs as to the mental condition of such person.... It shall be competent for the judge, if sitting without a jury, or the jury, if one is impanelled, to determine not only the sanity of the accused at the time of the hearing, but as well the sanity of the accused at the time the offense charged against him is alleged to have been committed.
 If it shall be determined after hearing as aforesaid, that the accused was insane at the time the offense charged against him is alleged to have been committed, the charge against him shall be dismissed on this ground and the records of the proceedings so noted. In this event, the judge or jury, as the case may be shall also find separately whether his insanity in any degree continues, and, if it does, shall order him into safe custody and direct him to be sent to the New Jersey state hospital at Trenton, to be confined as otherwise provided by law, and maintained as to expense as is otherwise provided for the maintenance of the criminal insane, until such time as he may be restored to reason, and no person so confined shall be released from such confinement except upon the order of the court by which he was committed. This section shall not be construed to prevent the use of the writ of habeas corpus.
 
 
 [2]
 See N.J.S.A. 2A:163-2 (repealed 1978). The legal problems arising out of the order incarcerating a defendant found not guilty by reason of insanity are discussed in our prior opinion. Scott v. Plante, 532 F.2d 939, 948-49 (3d Cir. 1976). The current state law provisions, codified at N.J.S.A. 2C:4-6 (Supp.1980), grant the judge discretion to commit civilly the accused to "an appropriate institution."
 
 
 [3]
 There is a docket entry on April 12, 1976 referring to an "order to show cause reappointing two independent expert witnesses, who are psychiatrists, to examine the plaintiff, etc." The certified record, however, lists this document (and many others) as "missing." There is no docket entry or record document disclosing any disposition of the order to show cause
 
 
 [4]
 WHEREFORE, plaintiff demands that this Court:
 A. Issue an order that the plaintiff be released since his confinement is illegal in that the standard applied in his commitment hearing was a liberal one whereas the standard applied in determining his release has been a more stringent test;
 B. Ordering that the plaintiff be released from his confinement for the failure of the defendants to treat or otherwise attempt to rehabilitate the plaintiff;
 C. In the event that this Court does not find that the plaintiff is entitled to release as requested in paragraphs A & B, that this Court enter an Order transferring the plaintiff to the civil section of the hospital in accordance with the requirement that the least restrictive means of confinement be utilized;
 D. Enter a declaratory judgment that the utilization of a less stringent test for the plaintiff's original commitment and the utilization of a more stringent test for his release to be violative of the plaintiff's rights to due process under both the United States and New Jersey State Constitutions;
 E. Enter a declaratory judgment that the standard of proof to be applied in release hearings in determining whether or not the plaintiff is either a danger to himself or to others be that standard of proof beyond a reasonable doubt;
 F. Enter a declaratory judgment that in the event that the confinement of the plaintiff is warranted, it must be the least restrictive confinement;
 G. Enter a declaratory judgment that if the confinement of the plaintiff is found to be warranted, that an individual treatment plan specifically designed for the plaintiff alone, must be immediately implemented within thirty (30) days;
 H. Enter a declaratory judgment that if the confinement of the plaintiff is warranted, that the defendants must provide for adequate medical and psychiatric care, and that the same should include at a minimum, the requirement for a complete physical once every six (6) months;
 I. Enter a declaratory judgment that the defendants' failure to provide for sanitary and otherwise minimally humane living conditions, including adequate heat, constitutes a violation of the plaintiff's constitutional rights to be free from cruel and unusual punishment;
 J. Enter a declaratory judgment that the failure to allow the plaintiff at hearings to determine his release to produce witnesses on his own behalf, to have the hearing open to the public, and to be furnished with a written decision containing a statement of the reasons for the decision, constitutes a violation of plaintiff's constitutional rights to a meaningful hearing under the due process clause of both the New Jersey State and United States Constitutions;
 K. Enter an order preliminarily and permanently enjoining the defendants, their agents, successors, employees, and all other persons acting in concert or participation with them, or at their direction or under their control, from further administering any medication without first obtaining the proper consent in accordance with law;
 L. Entering preliminarily and permanently a mandatory injunction to compel the defendants, their agents, successors, employees, and all other persons acting in concert or in participation with them or at their direction or under their control, compelling them to provide a sanitary cell, providing heat in the cell which heat should be at a minimum of 68o during the day and at a minimum of 60o during the night, and otherwise provide for minimally humane and safe living conditions;
 M. Enter, preliminarily and permanently, a mandatory injunction compelling the defendants, their agents, successors, employees, and all other persons acting in concert or in participation with them, or at their direction or under their control, to provide an individual treatment plan designed specifically for the plaintiff alone within thirty (30) days;
 N. Enter, preliminarily and permanently, a mandatory injunction compelling the defendants, their agents, successors, employees, and all other persons acting in concert or participation with them, or at their direction, or under their control, to provide that hearings to determine the release of the plaintiff be opened to the public and that the plaintiff be allowed to present witnesses on his behalf, and that the plaintiff be allowed to receive a written decision which decision shall include a statement of reasons for the decision;
 O. Enter, preliminarily and permanently, a mandatory injunction compelling the defendants, their agents, successors, employees, and all other persons acting in concert or participation with them, or at their direction or under their control, to provide a law library for the plaintiff or in the alternative access to an existing law library in order that plaintiff's access to the courts not be further impeded;
 P. Judgment for damages, both compensatory and punitive, for the illegal detainment of the plaintiff, for the failure to provide an individual treatment plan for the plaintiff, for the failure to otherwise provide adequate medical and psychiatric care and treatment for the plaintiff, for the failure to provide minimally humane and safe living conditions, and for the administration of medication without first having obtained the proper consent.
 
 
 [5]
 The Attorney General represented all defendants. No cross-claims were filed
 
 
 [6]
 Proposed jury instructions were set forth in an appendix to Romeo :
 A. If you find that the plaintiff was involuntarily committed for treatment, and no treatment was administered, and no compelling explanation for the lack of treatment was offered, you may hold the defendants liable.
 B. If you find that the plaintiff has received some treatment, you must then determine whether the treatment is regarded as acceptable in light of present medical or other scientific knowledge. If you find that it is not acceptable, you may find for the plaintiff. In addition, if the evidence does not demonstrate that there is a relationship between the treatment administered and the plaintiff's needs, even if the treatment is arguably regarded as acceptable in other situations, then you may find for the plaintiff. In deciding upon the adequacy of the treatment program adopted you may consider the defendants' explanations regarding security concerns, administrative necessities and fiscal constraints.
 644 F.2d 172.
 
 
 [7]
 The charge requested is:
 "It is well settled in this circuit that liability based directly upon 42 U.S.C. § 1983 cannot be based on a theory of vicarious liability, but instead requires actual participation in the unlawful conduct, or actual knowledge of and acquiescence in that conduct." Coggins v. McQueen, 447 F.Supp. 960, 966 (E.D.Pa.1978).
 
 
 [8]
 Because a new trial on liability and damages is granted on other grounds to be discussed later, the district court will have an opportunity to make its charge on the "good faith" defense more specific so that the nature of the defense will be clearly presented to the jury. See O'Connor v. Donaldson, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)
 
 
 [9]
 Courts have not limited "least restrictive" analysis to a choice between outpatient services and institutionalization. Within this Circuit, the doctrine has been used to make finer distinctions. Thus, in Eubanks v. Clarke, 434 F.Supp. 1022 (E.D.Pa.1977), Chief Judge Lord wrote:
 Fundamental rights are implicated where the state civilly commits an incompetent person to a mental hospital which is substantially more restrictive than other state mental hospitals to which one could be sent.
 We hold that at a minimum, where a state has varying available facilities for the mentally ill which differ significantly in the amount of restrictions on the rights and liberties of the patients, due process requires that the state place individuals in the least restrictive setting consistent with legitimate safety, care, and treatment objectives.
 
 
 [434]
 F.Supp. at 1027-28. See also Kesselbrenner v. Anonymous, 33 N.Y.2d 161, 350 N.Y.S.2d 889, 891, 305 N.E.2d 903, 905 (1973) (transfer of civilly committed patient, believed dangerous, to penal facility for the criminally insane without consideration of less restrictive alternatives held unconstitutional)
 
 
 [10]
 Covington was charged with murder, but civilly committed after being found incompetent to stand trial. In ten years at the maximum security pavillion he had never been violent or unruly
 
 
 [11]
 There is no justification for treating material differences among intramural dispositions as de minimis. Indeed, the Supreme Court has not ignored differences of degree within the context of criminal incarceration. Cf. Wolff v. McDonnell, 418 U.S. 539, 571-72 n.19, 94 S.Ct. 2963, 2982 n.19, 41 L.Ed.2d 935 (1974) (prisoner entitled to due process safeguards when officials substantially increase the severity of his confinement). The argument for judicial review in the civil commitment context is even stronger
 Although Scott was initially placed under maximum security, this fact does not relieve the state of any obligation to justify continuing imposition of such severe restrictions. Cf. O'Connor v. Donaldson, 422 U.S. 563, 574-75, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975): "Nor is it enough that (the inmate's) original confinement was founded upon a constitutionally adequate basis, ... because even if his involuntary commitment was initially permissible, it could not constitutionally continue after that basis no longer existed." Since Scott filed his amended complaint in 1978, the State of New Jersey has itself, recognized that the condition of civilly committed patients is subject to possible change and thus now utilizes mandatory periodic review procedures in state courts to tailor restraints to changed circumstances. See New Jersey Court Rules 4:74-7(f) (1980); State v. Fields, 77 N.J. 282, 390 A.2d 574 (1978). When the state fails in a Fields hearing to justify continuance of the status quo, the judge "mold(s)" a new order providing for "the least restrictive restraints" found "consistent with the well-being of the community and the individual." 390 A.2d at 584. The record shows no such hearing being held in Scott's case and the trial court made no findings as to the reasons why, if any. The analogy to state law does not stay the hand of this court to remedy denial of Scott's federally-protected constitutional rights, but it does suggest that our holding today need not inevitably flood the federal courts with petitions for relief.
 
 
 [12]
 The fact that Scott is mentally ill and possibly dangerous, rather than retarded, as Romeo was, affects only the nature and weight of the state's justifications for its restraints. Romeo left no doubt, however, that all civilly committed patients, both dangerous and non-dangerous, were entitled to have the conditions of their confinement subjected to strict scrutiny. Both enjoy the right of unconvicted citizens to be free from punishment. Both enjoy a right to treatment, and thus to the extent severe physical deprivations and restraints are contratherapeutic, such measures conflict with one of the original rationales for confinement
 Although some patients may be so dangerous that only maximum confinement can adequately protect the safety of others, courts should not conclude that all patients committed on grounds of dangerousness must be so confined permanently. Our understanding of mentally ill persons believed dangerous remains sadly limited; but at least one research study suggests that states may have been employing unnecessarily restrictive forms of confinement for them. The results were reported in Chambers, Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives, 70 Mich.L.Rev. 1107, 1136-37 (1972):
 (Baxtrom (Baxstrom) v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966)) had the effect of forcing the state of New York to transfer 992 patients from Matteawan, an especially secure hospital for the criminally insane, to regular mental hospitals elsewhere in the State. Researchers followed all 992 patients for a year. They found that all but seven of the 992 had fared well enough in less secure, often unlocked facilities that the new hospitals had not seen a need to seek their return to more secure facilities. Indeed, 147 were discharged to the community, far more than would have been released from Matteawan in an average year, and those who remained in regular hospitals seemed indistinguishable to the staffs from the general hospital population. The study may provide little firm indication of how the same men would have fared if never hospitalized at all or if placed initially in a minimum security hospital, but it should increase courts' skepticism both about claims that a person is dangerous and about claims that hospitalization is necessary. (citations omitted).
 
 
 [13]
 We made clear in Romeo that our holding extended beyond the use of locks and chains. Deference to administrative and fiscal constraints must give way, we indicated whenever a claimed post-commitment abridgment "reach(es) the status of a gross deprivation or squarely cut(s) across constitutionally protected interests...." At ----. Obviously not all unpleasant conditions of confinement, some of which are inherent in large-scale institutions, constitute "gross deprivations." Although no doubt the line between punishment and discomfort is not always a bright one, nonetheless we are convinced that severe restrictions on intramural mobility or unsanitary, climatically extreme conditions which endanger health amount to punishment and cannot be ignored by courts
 
 
 [14]
 Cf. Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (pretrial detainees, 85% of whom were released within 60 days)
 
 
 [15]
 Far from being justified by an overriding state interest, excessive physical restraints would conflict with the state's interest as proclaimed in N.J.S.A. § 30:4-24.2(e)(2), which entitles mental patients, civilly committed because dangerous, "to the least restrictive conditions necessary to achieve the purposes of treatment."
 
 
 [16]
 Defendants' principal defense at trial for the disgraceful living conditions at the Vroom Building was budgetary constraint. With regard to bodily restraints, Romeo expressly indicated that "except in emergency situations, inadequate resources or administrative rationales offer an insufficient basis for intrusions of this kind on a fundamental liberty interest." At 161
 
 
 [17]
 In addition to Dr. Folmer's report, noted earlier, there was even testimony that such transfer was offered to Scott as an inducement for him to drop this suit
 
 
 [18]
 Although defendants' lone witness, Dr. Musikoff, testified that some physical improvements had recently been accomplished and that several more were planned, nonetheless the budget requests submitted by defendant Klein and introduced as exhibits indicate that such promises provide inadequate assurance. For example, a new forensic facility was proposed, but eventually deleted from 1978 bond issue legislation. Even a $500,000 budget request for "emergency repairs" to the Vroom Building was only listed 12th in priority in the Hospital's capital budget request for FY 1980. As for Scott's placement in a cleaner, improved cell beginning December, 1978, we note that his testimony reveals several transfers from one cell to another over the past several years. In light of these considerations budgetary restraints and the apparent frequency of cell transfers we believe Scott is entitled to the protection of a specific injunction
 
 
 [19]
 The jury may have been unimpressed with such testimony in light of testimony by plaintiff's expert witness that "suitable" treatment requires one and preferably two or three such sessions per week
 
 
 [20]
 See Instructions I and III-A in the appendix to Romeo v. Youngberg, supra, at 172 - 173
 
 
 [21]
 See N.J.S.A. § 30:4-24.2; State v. Carter, 64 N.J. 382, 316 A.2d 449 (1974); State in Interest of RGW, 145 N.J.Super. 167, 366 A.2d 1375 (J & D.R.Ct.1976)
 
 
 [22]
 Plaintiff cannot be heard to complain that our rejection of defendants' immunity defense necessarily implies sufficient bad faith has been shown to support punitive damages. The defense of official immunity depends on defendants establishing good faith, and we concluded in Part VI-A that they failed to carry this burden. With respect to punitive damages, however, it is the plaintiff who bears the risk of non-persuasion on the issue of malice or recklessness. We, therefore, find nothing inherently inconsistent about upholding the judgment of liability for violation of constitutional rights, while expressing doubts about the award of punitive damages