BONJORNO, Joseph A., Kerr, George M., and Clisby, Barbara K., as Transferees of Liquidation and Dissolution of Columbia Metal Culvert Co., Inc., Appellants and Cross-Appellees,

v.

KAISER ALUMINUM & CHEMICAL CORPORATION, Kaiser Aluminum & Chemical Sales, Inc., Robert A. Kennedy and Kennedy Culvert & Supply Company and Robert Kennedy, Kaiser Aluminum & Chemical Corporation and Kaiser Aluminum & Chemical Sales, Inc., Appellees and Cross-Appellants.

Nos. 83–1047, 83–1079.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 1983.

Decided Dec. 27, 1984.

Opinion on Denial of Rehearing and Rehearing En Banc March 8, 1985.

---

804

Henry T. Reath, Michael M. Baylson (argued), Eric H. Auerbach, Richard L. Thurston, Duane, Morris & Heckscher, Philadelphia, Pa., for appellants and cross-appellees.

Richard P. McElroy (argued), William H. Roberts, Alexander D. Bono, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., Stephen B. Ringwood, Kaiser Aluminum & Chemical Corp., Oakland, Cal., for appellees and cross-appellants.

Before SEITZ, GIBBONS and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SEITZ, Circuit Judge.

### I.

The plaintiffs appeal from an order of the district court partially granting judgment notwithstanding the verdict which eliminated the largest element of the jury's damage award in an antitrust action. The defendants, Kaiser Aluminum and Chemical Corporation and Kaiser Aluminum and Chemical Sales, Inc. (collectively "Kaiser") cross-appeal from a judgment entered after a special jury verdict finding them in violation of the antitrust laws. This court has jurisdiction under 28 U.S.C. § 1291 (1982).

### II. Background

The plaintiffs were the sole stockholders of the now defunct Columbia Metal Culvert Co., Inc. ("Columbia") which was at one time a fabricator of aluminum drainage pipe in Vineland, New Jersey. They allege that Kaiser monopolized the market for aluminum drainage pipe in the Mid-Atlantic region of the United States in violation of sections one and two of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1982).

Columbia began to manufacture aluminum drainage pipe in 1962. Originally, Columbia purchased all of its raw materials from Kaiser. The raw material for manufacturing pipe comes in two primary forms: corrugated aluminum sheet which is rolled and riveted into pipe, and aluminum coil which is formed into helical pipe by a spiraling machine. Initially, Columbia purchased only sheet, but in 1970, it acquired a spiraling machine, and thereafter produced mostly pipe formed from coil.

In 1972, Columbia and Kaiser had a falling out, after which Kaiser no longer sold coil to Columbia, which thereafter purchased its raw materials from Alcoa and Reynolds. In 1973, Columbia's best salesman, Robert Kennedy, left Columbia to become an independent distributor of Kaiser's aluminum pipe. At the same time, Kaiser opened a pipe fabrication plant only a few miles from Columbia's. In 1974, Kaiser along with the other major aluminum producers raised the prices of aluminum coil and sheet to roughly the same price that Kaiser charged for the finished pipe. Throughout this period, Kaiser produced approximately 80% of all the aluminum pipe used in Columbia's geographical marketing region.

The plaintiffs allege that as a result of Kaiser's conduct, Columbia began experiencing financial difficulties, and stopped producing pipe in 1975. Eventually, Columbia's assets were sold to a third party

in 1978. In 1981, the third party sold the remaining assets of Columbia to Kaiser.

This action was first filed in January of 1974 under section four of the Clayton Act, which gives a private cause of action under the antitrust laws, alleging, *inter alia*, violations of sections one and two of the Sherman Act. At the first trial in 1977, the district court directed a verdict for Kaiser at the conclusion of plaintiff's evidence. This court reversed, holding that there was sufficient evidence to permit the case to go to the jury. *Columbia Metal Culvert Co., Inc. v. Kaiser Industries Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). A second trial held in 1979 resulted in a jury verdict for the plaintiffs and an award of damages. The district court, however, granted in part the defendants' post-trial motion for a new trial by ordering a trial on damages only. *Bonjorno v. Kaiser Aluminum & Chemical Corp.*, 518 F.Supp. 102 (E.D.Pa.1981). A limited retrial was conducted in 1981, resulting in a damage award of $9,567,939 after trebling. The district court then granted, in part, the defendant's motion for judgment notwithstanding the verdict, reducing the judgment to $4,651,560. 559 F.Supp. 922 (Pa.1983).

The plaintiffs appeal the reduction of the damage award, and the defendants cross-appeal the failure of the district court to grant a new trial or to grant in full their motion for a judgment notwithstanding the verdict. We turn first to the defendants' cross-appeal.

### III. The Doctrine of Intra-Enterprise Conspiracy

The defendants contend that the jury verdict must be set aside and a new trial ordered because of the recent decision in *Copperweld Corp. v. Independence Tube Co.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). In that case, the Supreme Court held that a parent corporation and its wholly owned subsidiary cannot be considered separate entities for purposes of section one of the Sherman Act. Thus, a parent corporation and its wholly owned subsidiary cannot by themselves violate that provision which requires concerted action by at least two participants. Because the two entities in the section one claim in this case are the Kaiser Aluminum & Chemical Corporation ("KACC") and its wholly owned subsidiary Kaiser Aluminum & Chemical Sales, Inc. ("KACSI"), the defendants contend that the finding of liability must be set aside if the *Copperweld* rationale is applicable to this case.

This court had previously held that the plaintiff could proceed with a section one claim based on a conspiracy between the parent KACC and its subsidiary KACSI. 579 F.2d at 33–35. After oral argument was heard on this appeal, the Supreme Court granted the petition for certiorari in the *Copperweld* case. The parties were asked to submit supplemental briefing on the potential effect of *Copperweld*. After due consideration, we decided to defer resolution of this appeal until after the Supreme Court decided *Copperweld*.

Having now considered the decision of the Supreme Court, we believe that it is unnecessary to reach the issue of the applicability of *Copperweld* because the damage award may be sustained solely on the separate section two verdicts that do not depend on a theory of intra-enterprise conspiracy. Kaiser contends that when a verdict may rest on either of two claims, one supported by the evidence and the other not, a judgment thereon must be reversed. *See Simko v. C & C Marine Maintenance Co.*, 594 F.2d 960 (3d Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 64, 62 L.Ed.2d 42 (1979). The case that Kaiser cites, *Simko*, rested on a general verdict in which it is impossible to determine if a jury found the defendant liable on both grounds or only one ground. In this case, special interrogatories were submitted to the jury on each of the theories of liability, and the jury determined that the defendants violated both section one and section two of the Sherman Act. Under these circumstances, we are not required to remand for a new trial solely because the section one claim may be invalid.

The defendants argue, however, that the causation of damages from the monopolization and attempt to monopolize verdicts are also tainted by the theory of intra-enterprise conspiracy. The jury returned separate verdicts against the defendants for monopolization, attempt to monopolize, and conspiracy to monopolize under section two. Although the conspiracy verdict, which depended upon an intra-enterprise

conspiracy, was separately rendered, only a single interrogatory was asked as to causation of injury. The jury answered "yes" to the question: "[W]as any such defendants' monopoly, conspiracy to monopolize, or attempt to monopolize as found by you a material and proximate cause of any injury to the business or property of the plaintiff?"

The defendants contend that *Copperweld* must necessarily apply to a section two conspiracy to monopolize, and since the jury was not asked separate questions on proximate cause, it is impossible to determine if the jury found that the injuries were caused by an impermissible theory of liability. The defendants' contentions succeed only if it were possible that the jury could infer that some of the plaintiffs' injuries resulted solely from the conspiracy and not from the monopolization or attempt to monopolize. Assuming without deciding that *Copperweld* applies to a section two conspiracy, we conclude that it was not possible for a reasonable jury in this case to find that injury was caused by conduct pursuant to the conspiracy that was not also conduct in furtherance of the monopolization or the attempt to monopolize.

■ Specific intent is an element of a conspiracy to monopolize. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953); *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 154 (3d Cir.1981), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). Because the jury was charged that it had to find that there was a specific intent to monopolize before returning a verdict on conspiracy to monopolize, the jury necessarily found that both the parent KACC and the subsidiary KACSI had the specific intent to monopolize the aluminum pipe market. Thus any concerted activity undertaken in the conspiracy that could give rise to damages would have been undertaken with the purpose of monopolization. Because the conspiracy defendants are the same defendants in the monopolization and attempt to monopolize charges, any activity in the conspiracy, which must have had the purpose of monopolization, would necessarily be attributable to the same defendants as part of the monopolization or attempt to monopolize.

■ Furthermore, the defendants do not point to any evidence in the record that evinces actions in the conspiracy that could give rise to damages and that are not necessarily part of the attempt to monopolize or the monopolization. Thus, under the particular circumstances of this case, we conclude that the jury verdict and award of damages would be the same even if the jury had not been instructed that KACC and KACSI could be considered separate entities.

## IV. The Monopolization Claim

### A. The Effect of This Court's Decision in 1977

■ We next turn to Kaiser's contention that its motion for a judgment notwithstanding the verdict should have been granted because the evidence was insufficient to support the claim of monopolization or attempt to monopolize. The plaintiffs argue that Kaiser may no longer raise this issue because this court had determined on the appeal from the first trial that there was sufficient evidence of monopolization to go to the jury. *Columbia Metal Culvert Co. v. Kaiser Industries Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

The evidence presented at the liability 1979 trial, however, differed in several material respects from the evidence presented at the first 1977 trial. In particular, the plaintiffs' evidence at the later 1979 trial significantly undercut the economic significance of the facts that the parent KACC charged its subsidiary KACSI a price for aluminum sheet and coil that was well below the market price while at the same time KASCI was selling coil to independent pipe fabricators at the higher market price. Kaiser's pricing policies with respect to its subsidiaries and to independent fabricators were elements of our earlier decision. 579 F.2d at 31.

Because there were material differences in the evidence presented at the two trials, we believe that the question of the sufficiency of the evidence presented at the 1979 liability trial is still open for review. *See Johnson v. Bernard Ins. Agency, Inc.*, 532 F.2d 1382, 1384 (D.C.Cir.1976).

808

### B. Sufficiency of the Evidence of Monopolization

There are two main elements in monopolization: "(1) the possession of monopoly power in a relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *Borough of Landsdale v. Philadelphia Elec. Co.*, 692 F.2d 307, 311 (3d Cir.1982).

Kaiser's contentions on liability in this appeal go to the question of whether there is insufficient evidence that its alleged conduct demonstrates the willful acquisition or maintenance of monopoly power.[1]

In reviewing a record for sufficiency of the evidence, this court must expose the evidence to the light most favorable to the non-movant with the advantage of every fair and reasonable inference. *Continental Ore Co. v. Union Carbide & Carbon Co.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171 (3d Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977).

1. *Kaiser Attempted to Control Its Competition.* There was evidence that Kaiser attempted to control the independent fabricators by requiring them to purchase all of their raw materials from Kaiser. Mr. Bonjorno of Columbia, and Mr. Arvay of U.S. Aluminum, a South Carolina fabricator, both testified that Kaiser attempted to coerce the fabricators into purchasing only from Kaiser. There was testimony that Holmes Collins, the Kaiser manager of the division that manufactured and marketed the aluminum pipe, threatened to open a pipe fabrication plant "across the street" from Columbia if it purchased its raw materials from other sources. There were threats that if Kaiser saw so much as

one pound of metal from another producer that it would terminate its relationship with Columbia. When Columbia did purchase aluminum from another company, Kaiser carried through with its threats by locating a pipe plant only 40 miles from Columbia's and by refusing to sell any more coil to Columbia. Finally, there was evidence that Holmes Collins told Columbia's owners that Kaiser would control Columbia's growth and market.

From this evidence, a jury could infer that Kaiser wanted to control the source of the raw materials for the independent fabricators and thus, indirectly, wanted to control the price of independents' finished pipe. The mere location of a plant, or the unilateral refusal to deal may not, by themselves, be antitrust violations. However, the combination of the threats as well as evidence that Kaiser's management had originally requested that the plant be located elsewhere is evidence from which a jury could legitimately infer that Kaiser attempted to control its competition, and failing that, tried to destroy it.[2] *Schine Theatres v. United States*, 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948) (threat of opening theatres by a monopolist is evidence of intent) (*Copperweld, supra*, overruled the section one charge in *Schine*, but re-affirmed the section two charge).

2. *Kaiser's Actions to Destroy Columbia.* In addition to locating a plant near Columbia's, the plaintiffs allege that Kaiser engaged in a series of deliberate acts to drive Columbia out of the pipe market. The most serious claim is that Kaiser deliberately raised the price of the raw materials to the same level as the price that it charged for the finished pipe, thus making it impossible for Columbia to operate at a profit if it sold pipe competitively with Kaiser. The plaintiffs term this price condition a "price squeeze."

The evidence and the record show that for a significant period of time in 1974,

---

1. In this appeal, Kaiser does not contest that the relevant product market is aluminum drainage pipe, or that the relevant geographic market is the Mid-Atlantic states. Nor do any of the issues raised by Kaiser in this appeal relate to whether it possessed monopoly power or whether that power was a consequence of a superior product, skill, or historical accident.

2. Further evidence of Kaiser's attempt to control or exclude competition lay in the veiled threats that Holmes Collins made to Alcoa. Alcoa's manager testified that Collins stated that "if [Alcoa] thought that [it] could sit back and enjoy a participation in this market by merely being a supplier of coil sheet to independent pipe fabricators, [Alcoa] had another thing coming, or some words to that effect." App. at 1085.

the distributor list price of Kaiser's aluminum pipe, per pound, was just above, or even below, the market price for aluminum coil. The mere existence, however, of a "price squeeze" is not necessarily an antitrust violation. The plaintiff must present evidence that the defendants deliberately produced the effect, sufficient to provide a reasonable basis for the jury to conclude that the "squeeze" was not the result of natural market forces such as supply and demand or legitimate competition. *Cf. California Computer Prods. Inc. v. IBM,* 613 F.2d 727, 735 (9th Cir.1979).

To show that the price squeeze was a deliberate act on the part of Kaiser, the plaintiffs produced evidence that Kaiser controlled both the price of the raw material and the price of the finished pipe, and that Kaiser exercised that power. That Kaiser could control the price of the finished pipe is evident. By setting the price at which it sold to distributors, Kaiser effectively controlled the prices at which the distributors bid to contractors. Further, because of Kaiser's large market share, it was likely that it or one of its distributors would be bidding on nearly every job. In this fashion, Kaiser, if it desired, could keep the prices of the pipe low.

The plaintiffs' evidence of Kaiser's control over the prices of the raw material, aluminum coil, is more problematic. In part, it lies in understanding the nature of the market for aluminum coil and sheet used in fabricating pipe. Prior to 1974, Kaiser and some of the other aluminum producers maintained a separate price list, called a commodity price, for aluminum alloy sold to fabricators to manufacture pipe. The commodity price was usually lower than the general or specification price charged for the same alloy used for other purposes. It was never contended, however, that Kaiser lost money at the lower commodity price, and KACSI usually reported a profit from the sale of coil and sheet at the commodity price. App. at 4674–4824.

Kaiser was not the largest supplier of aluminum coil or sheet to independent fabricators, although if the aluminum used by its own pipe plants were included, it produced over 80% of the aluminum used for making pipe. Kaiser contends that since it was not the dominant force in the commodity price market for aluminum coil and sheet, it did not control the prices of the raw materials. The plaintiffs' theory, however, was that Kaiser was a price leader, and that Reynolds and Alcoa, the other major aluminum producers, usually followed Kaiser's pricing strategy. Thus, Kaiser's prices would determine the market prices.

The principal evidence in support of this theory was the testimony of Professor Oliver Williamson, an economist and expert in antitrust. He testified that the aluminum industry was an oligopoly limited to a few major producers of aluminum, and that in particular lines of aluminum products, one of the producers became dominant and set the pricing strategy for the rest of the industry. He indicated that the other aluminum producers usually followed the price leader because if an aluminum producer did not comply, it would not be followed in the areas where it was dominant. He further indicated that there were economic studies that tended to show that the price leadership phenomenon was especially noticeable during the early to mid-1970's and that aluminum prices were kept high by the producers during the relevant period.

Further, Dr. Williamson testified that he believed that Kaiser was the dominant firm in setting the prices for aluminum coil and sheet used in making pipe. Dr. Williamson's opinion that Kaiser was the dominant firm in the aluminum pipe area was buttressed with evidence that showed that Kaiser was the largest producer of coil used for pipe, that it was the only major manufacturer who had an extensive marketing and engineering staff who actively promoted and studied the uses of aluminum pipe, and that Kaiser had the largest interest in pipe prices because it sold over 80% of the aluminum pipe in the country. If there were price leadership, it would be most likely that Kaiser set the pricing policies because of its extensive expertise and investment, rather than Reynolds or Alcoa who had so little involvement in the area.

That there was price leadership was supported by the testimony of Thomas Melrose, a manager of Alcoa, and Lonsdale Lawrence, an engineer from Reynolds. Melrose testified that Alcoa did not independently set prices but followed the prices that Kaiser and Reynolds set for the corru-

gated aluminum sheet used for making pipe. Lawrence testified that for corrugated sheet, Reynolds would follow Kaiser's announced prices each time the prices changed. Although Melrose's and Lawrence's testimony was in reference to corrugated sheet and not to coil, their testimony confirms Dr. Williamson's general observations on the existence of price leadership in the aluminum drainage pipe raw material market. Further, the evidence indicated that the prices for coil and sheet as raw materials for pipe did not differ in material respects.

Kaiser contends, however, that the plaintiffs' documentary evidence on the actual prices charged by the three major manufacturers failed to show price leadership. In particular, Kaiser points to evidence that on one occasion Alcoa raised the price of aluminum coil three days before the effective date of Kaiser's comparable price change as proof that Alcoa, and not Kaiser, was the price leader.

Dr. Williamson testified, however, that a pricing change did not have to be initiated by the price leader. Also, Alcoa's price change, although occurring three days before the effective date of Kaiser's change, may have been made after Kaiser announced its change either publicly or privately.

■ At most, Columbia's pricing evidence was susceptible of an inference inconsistent with price leadership. When contradictory inferences can be drawn from the evidence, the question should be resolved by the jury and it is not a matter for the consideration of the court on a motion for a JNOV. Given that Dr. Williamson's opinion was well supported by the evidence, we cannot say that the question of price leadership should not have gone to the jury.

■ The next question is whether the evidence shows that Kaiser deliberately manipulated the coil and pipe prices to create a squeeze. There was evidence that the squeeze was not caused by natural market forces.

The most significant evidence of deliberate manipulation of the coil prices was Kaiser's withdrawal of the commodity price for coil in January of 1974. This caused a steep rise in the price of coil from about 38 cents per pound to about 44 cents per pound. At approximately the same time, Alcoa and Reynolds raised their coil prices to the same price levels. Dr. Williamson testified that he believed that the price hike was made for "strategic" reasons. Even Kaiser's manager, Holmes Collins, testified that the commodity price was withdrawn because Kaiser no longer wished to sell to independent fabricators. Thus, Collins' testimony supported an inference that the price change was not related to costs but was intended to affect the independent competition.

Perhaps some of the strongest evidence that the price squeeze was deliberate lies in the relationship of the price of coil charged by Kaiser and its distributor price for pipe. If the coil prices charged by KACSI truly reflected the cost of the coil plus a fair return, then the price of the finished pipe should be higher by at least the fabrication cost of the pipe. However, the price of the pipe was often below the price of the coil during the first six months of 1974. Alternatively, if the price of the pipe reflected Kaiser's true costs plus a fair return, then the price of the raw material should be less by at least the cost of the fabrication. Thus, either the pipe prices were too low, or the raw material prices too high.

Further evidence that the price squeeze was deliberate lay in the transfer price system used by Kaiser. The transfer price is the price that the parent KACC charged its subsidiary KACSI for aluminum. The transfer price was a fixed price per pound that is set once a year and reflects the projected direct costs of producing the aluminum and excludes an allowance for corporate overhead. As such, the transfer price is usually well below the market price. Although the transfer price system itself is not evidence of classic predatory behavior, Kaiser's system permitted KASCI to set coil prices for its competitors without affecting its pipe costs. Usually, the market price of the raw materials determines the price of the finished product. In this case, Kaiser could set whatever market price it chose for the raw material, within certain limits, without directly affecting its market price for pipe.

Given these facts, there was sufficient evidence for the jury to conclude that Kai-

ser not only possessed the power to create the price squeeze, but that it exercised that power to destroy its competition. *See United States v. Alcoa,* 148 F.2d 416 (2d Cir.1945).

There is additional evidence that Kaiser sought to destroy Columbia by setting up Robert Kennedy as a distributor. There is evidence that Kaiser extended credit to Kennedy even though its credit department concluded that Kennedy's operation was an "unacceptable credit risk." App. at 4466. The jury could infer that by going against the very strong recommendation of its credit department, Kaiser displayed its intent to drive Columbia out of business. *See Columbia,* 574 F.2d at 31. *Cf. Greyhound Computer v. IBM,* 559 F.2d 488, 498 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 796 (1978) (If a jury concludes that a manufacturer possesses monopoly power, then it would be precluded from otherwise lawful practices that exclude competition). Although Kaiser contends that the credit department did eventually approve of the Kennedy account, the evidence indicates that during the first year, Kaiser extended Kennedy up to at least $78,000 credit secured by no more than Kennedy's $25,000 letter of credit and by a security interest in the accounts receivable, which was not much more than the security earlier evaluated by the credit department as unacceptable. App. at 4466.

Further, contrary to Kaiser's contentions, we do not consider that Kennedy's dismissal as a defendant renders the evidence of Kennedy's activities irrelevant to the monopolization claims against Kaiser. The district court's instructions in this regard were fully consistent with this court's earlier opinion. *See Columbia,* 579 F.2d at 31, 36.

When a monopolist competes by denying a source of supply to his competitors, raises his competitor's price for raw materials without affecting his own costs, lowers his price for the finished goods, and threatens his competitors with sustained competition if they do not accede to his anticompetitive designs, then his actions have crossed the shadowy barrier of the Sherman Act. *See* Handler, Some Unresolved Problems of Antitrust, 62 Colum.L.Rev. 930, 934 (1962). Given the evidence of Kaiser's anticompetitive behavior, we hold that there was sufficient evidence to permit the monopolization claim to go to the jury.[3]

V. Contradictory Evidence Presented at the Liability and Damage Trials

Kaiser also contends that a judgment notwithstanding the verdict (JNOV) should have been granted because the plaintiff produced evidence at the trial on damages that contradicted the evidence presented at the liability trial. Kaiser, however, fails to explain the legal theory supporting its contention.

Normally, when the evidence is contradictory, a JNOV is inappropriate. *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir.1976), *cert. denied,* 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). The assumption is that the jury should decide factual issues involving contradictory evidence. In this case, however, no single jury heard all of the allegedly contradictory testimony. Kaiser's argument must be that if a single jury had heard both the evidence on liability and damages, then that jury would not have returned a verdict against Kaiser. Under this theory, however, a JNOV is not the proper remedy in this case. There was sufficient evidence of monopolization to go to the jury, even if, as Kaiser contends, the plaintiffs' introduced evidence that was inconsistent with their theory of liability.

The proper remedy, at best, would be a new trial on both liability and damages. Kaiser, however, does not argue for a new trial on the ground that testimony inconsistent with the theory of liability was introduced at the damages trial.

Even if we were to construe Kaiser's arguments for a JNOV as a request for a new trial in the alternative, we do not believe that substantial justice dictates that a new trial be ordered. *Cf. Scott v. Plante,* 641 F.2d 117, 136 (3d Cir.1981), *vacated on other grounds,* 458 U.S. 1101,

---

**3.** Kaiser does not contend on this appeal that there was insufficient evidence as to any issues, such as specific intent to monopolize or a dangerous probability of achieving monopoly power, that relate solely to the attempt to monopolize claim. *See Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir.1975).

102 S.Ct. 3474, 73 L.Ed.2d 1362 (1982). If the district court committed error, it would have been in its failure to order a full new trial in 1981 when it ordered the limited retrial on damages. In general, the ordering of a new trial is committed to the sound discretion of the district court. In this case, we cannot say that the district abused its discretion. The liability trial was properly conducted and there was no need to expend further judicial resources retrying liability.

■■■ In some situations, however, the seventh amendment right to a jury trial is implicated if the issues in the separate retrial on damages are so interwoven with the issues of liability already tried that it is unjust to try the damages separately. *Gasoline Prods. Co. v. Champlin*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). In this case, it might be argued that the issues are interwoven if the theory of damages relied upon was inconsistent with the liability theory, thus requiring a single jury to resolve the inconsistency. We believe, however, that the issues are not interwoven because the theory of damages was consistent with the theory of liability.

■■■ Kaiser claims that Dr. Bowman, the plaintiffs' expert witness at the damages trial, contradicted the theory that the price squeeze was deliberately caused by Kaiser and not the result of natural market forces. First, Dr. Bowman testified that he could estimate a free market price for pipe by using the price of coil as a base figure and then adding to the coil price a certain percentage of the base figure to account for fabrication costs and a reasonable profit. In choosing a base figure, Dr. Bowman used the actual coil prices charged by Alcoa and Reynolds from 1973 to 1977. Thus, Kaiser charges, the implication of Dr. Bowman's testimony is that the coil prices would have been the same in a free market. However, the theory of liability was not that the prices of the raw materials were too high, but that Kaiser deliberately caused a price squeeze condition. The jury did not find that there was a price conspiracy among Kaiser, Alcoa, and Reynolds. The plaintiff was entitled to show that in a free market, either the pipe prices would have been higher or the raw material prices lower during the period of the price squeeze. In constructing a hypothetical world free of the defendants' exclusionary activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative. *See Litton Systems v. American Telephone and Telegraph Co.*, 700 F.2d 785, 822–23 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984). Dr. Bowman anchored his theory to the actual prices of coil over a five year period. If he had constructed a hypothetical price for coil to calculate a hypothetical price for pipe, his theory would have been far more speculative. Under present circumstances, we do not believe that the implications of Dr. Bowman's testimony were so inconsistent with the plaintiffs' theory of liability as to warrant a new trial.

The second set of statements that Kaiser alleges contradicts and disproves the price squeeze theory was a statement by Dr. Bowman that the free market price of pipe from 1973 to 1977 would have been "substantially similar" to the actual prices for pipe charged by Kaiser. Dr. Bowman, however, testified also that actual pipe prices were "depressed" and "tended to be lower" than his hypothetical free market pipe prices. App. at 6520 and 6531. If actual pipe prices were lower than the hypothetical prices, then his testimony was consistent with the liability theory. The only inconsistency is that Dr. Bowman appeared to contradict himself when he testified that the prices were "substantially similar."

Dr. Bowman's statements are not necessarily inconsistent. His statements applied to a five year period of time. Pipe prices may have been fair over a five year period and still have been depressed during the shorter time period involved in the price squeeze. Further, even if Dr. Bowman's testimony was internally inconsistent, it was an inconsistency entirely before the damages jury. Dr. Bowman's credibility was properly before the damages jury and is not grounds for a new trial.

## VI. Bifurcation of Trial on Liability and Damages

■■■ Kaiser next argues that because the liability jury did not distinguish among the alleged anticompetitive acts in its determination of causation, the damages jury

could not know from what acts they could attribute damages. Thus, Kaiser contends, the issues on liability could not be separated from the issues on damages. We believe that Kaiser has confused the questions of causation and calculation of damages. Causation is an element of liability in this case. *See REA v. Ford Motor Co.,* 560 F.2d 554, 557 (3d Cir.), *cert. denied,* 434 U.S. 923, 98 S.Ct. 401, 54 L.Ed.2d 281 (1977). The liability jury properly found causation from only those acts which could evince the defendants' willful acquisition or maintenance of a monopoly. *See Brunswick Corp. v. Pueblo Bowling Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). In finding causation, the jury must find the nexus between the act and the injury. Once a jury has properly found causation of antitrust injury from unlawful activity, however, the damages in this case may be determined without strict proof of what act caused which injury as long as the damages are not based upon speculation or guesswork. *MCI Communications v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

Here, this result follows because it would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act. The plaintiffs' basic injury was that Columbia was driven out of business. Further, the theory of the section two violation here is not that any one act in itself is unlawful, but that all the acts taken together show the willful acquisition or maintenance of a monopoly which damaged and forced Columbia out of business. When the antitrust injury is of an indivisible nature, the courts have permitted a relaxed standard of proof in calculating damages. *J. Truett Payne Co. v. Chrysler Motor Corp.,* 451 U.S. 557, 565–67, 101 S.Ct. 1923, 1929–30, 68 L.Ed.2d 442 (1981); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). When the antitrust injury is of an indivisible nature, and the jury properly found that that injury was caused by the defendants' monopolization or attempt to monopolize, and when the plaintiffs' proof of damages does not require distinguishing the various acts by the defendants, then it is unnecessary to segregate the damages according to the specific causes, and therefore, the issues in the liability trial are not so interwoven with the issues in the damages trial as to require a retrial of both.

## VII. Prejudicial Conduct During the Damages Trial

 Kaiser contends that the conduct of the damages trial was prejudicial to Kaiser because the jury was informed about some of the anticompetitive acts alleged by the plaintiff. It is of course necessary, when conducting a bifurcated trial before two juries, to inform the second jury about some of the evidence and results of the first trial. *MCI v. American Tel. & Tel. Co.,* 708 F.2d at 1168. This is not to say that the second jury was to evaluate or decide factual issues that were involved in the first trial. In this case, antitrust matters are extremely complex, and it would have been unfair not to give the jury some background material on the trial. Questions of trial conduct are committed to the discretion of the trial court. The trial court attempted to conscientiously balance the need of the jury to know about the case and prejudice to the defendant. We believe that the district court acted in an exemplary manner in its conduct of an extremely long and complicated trial and did not abuse its discretion in permitting the jury to hear some explanation of the finding of liability.

 Kaiser also contends that plaintiffs' counsel repeatedly flouted the district court's rules and referred to prejudicial matters. The district court, after reviewing the entire record, concluded that it was not sufficiently prejudicial to warrant a new trial. We find no abuse of discretion. *See Pitchford v. Pepi,* 531 F.2d 92, 106 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976).

## VIII. The Calculation of Damages

With respect to the separate trial on damages, Kaiser raises several issues. First, Kaiser contends that its motion for JNOV should have been granted because the projected market share analysis used for plaintiffs' calculation of lost profits failed to account for competition by other independent pipe fabricators. Kaiser fur-

ther contends that the failure of an expert to account for significant factors in his analysis was an error of law and subject to plenary review in this court. Presumably, Kaiser must be suggesting that the testimony of plaintiff's expert is inadmissible because it is unsupported; and if it were struck, then the remaining evidence would be insufficient to support the damages verdict and Kaiser would be entitled to a JNOV.

■ We note that Kaiser neither raised this issue specifically in a motion for a directed verdict, nor did it object to the jury instructions on this matter. Thus, Kaiser is not entitled to a JNOV, nor may it raise this issue on appeal as an error of law. *See infra Section IX*, Fed.R.Civ.P. 50(b), 51; *Abraham v. Pekarski*, 728 F.2d 167, 172 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); *Herman v. Hess Oil*, 524 F.2d 767 (3d Cir. 1975).

■ Even if, however, we were to construe Kaiser's motion for a directed verdict to have raised this question, we would not hold that the JNOV should have been granted. The testimony of Dr. Bowman made clear that he was aware of, and accounted for the presence of other aluminum pipe fabricators. His testimony was supported, and therefore, admissible. At best, Kaiser's contentions go to the weight of the evidence and not its admissibility. That, however, was for the jury. *Pitchford v. Pepi, Inc.*, 531 F.2d 92, 108–09 (3d Cir.1976).

■ As to Kaiser's remaining contentions on damages, we have examined the record and conclude that the district court did not err in allowing damages for both lost profits and actual losses; nor did the district court err in failing to instruct the jury on plaintiffs' duty to mitigate damages; nor did the district court err in permitting the jury to consider damages for lost profits on projected sales outside of the geographic and product markets stipulated for liability purposes.

## IX. The Plaintiffs' Appeal

The district court granted, in part, Kaiser's motion for JNOV as to one aspect of damages. It eliminated the jury award for diminution of going concern value as inappropriate as a matter of law when Columbia had not literally gone out of business as of the date used in the damage calculation.

The plaintiffs contend on their appeal that a grant of a JNOV was improper when Kaiser failed to assert this ground in its motion for a directed verdict at the close of all the evidence. *See* Fed.R.Civ.P. 50(b). Kaiser made an oral motion for a directed verdict at the conclusion of all the evidence on damages. Kaiser specifically asserted three grounds for a directed verdict: (1) the evidence failed to show that Columbia was injured by Kaiser; (2) the damage calculations included projected sales outside of the stipulated geographic market; and (3) there was insufficient evidence of a price squeeze. Kaiser never raised in its motion for a directed verdict the contention that damages based on a diminution of going concern value may not be awarded in this case.

■ The specific grounds for a JNOV must be asserted in the motion for a directed verdict. *Abraham v. Pekarski*, 728 F.2d 167, 172 (3d Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). If the issue was not raised in the motion for the directed verdict at the close of all the evidence, it is improper to grant the JNOV on that issue. *Id. See also Mallick v. IBEW*, 644 F.2d 228, 233–34 (3d Cir.1981); *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1035–36 (1st Cir.1984); *U.S. Industries, Inc. v. Blake Const. Co., Inc.*, 671 F.2d 539, 548 (D.C.Cir.1982).

■ The requirement that the specific issue be raised first in the motion for a directed verdict, before the issue is submitted to the jury, affords the non-moving party an opportunity to reopen its case and present additional evidence. *Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 11 (3d Cir.), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976). Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of his seventh amendment rights. *Id.*

■ In this case, · Kaiser contends that it raised the issue in a colloquoy with the district court concerning jury instructions. A request for jury instructions may

suffice to fulfill the requirement that a motion for a directed verdict be made before granting a JNOV only if it is clear that the district court treated the request as a motion for a directed verdict and ruled on it as such. *Mallick,* 644 F.2d at 234; *Lowenstein,* 536 F.2d at 11. We have studied the record in great detail at the places noted in Kaiser's brief and we can find nothing that would have put the plaintiffs or the district court on notice that after all the evidence had been presented Kaiser was raising an issue as to whether damages for diminution of going concern value could be awarded. The record shows that Kaiser only objected to the wording of a jury instruction and agreed that the instruction on diminution of going concern value could be submitted to the jury after it was reworded. App. at 7529–31.

■ Finally, even if, contrary to our conclusion, we were to assume that Kaiser had properly raised the issue in its motion for a directed verdict, it was error for the district court to have ruled for the defendants on this aspect of the motion for a JNOV. The plaintiffs' theory at trial was that damages for diminution of going concern value could be awarded as of the date that Columbia had effectively gone out of business. The plaintiffs argued to the district court that Columbia had ceased manufacturing operations prior to May 31, 1977 and would have gone out of business by that date because of Kaiser's anticompetitive activities if Columbia had not received an Economic Development Administration loan from the United States Department of Commerce. The loan permitted Columbia to continue operations for a few months before it ultimately went out of business and liquidated its assets. The plaintiffs presented evidence to support their theory and the jury was instructed, without objection, as to the plaintiffs' theory.

Kaiser neither submitted contrary jury instructions, nor did it object to the jury instructions as required by Fed.R.Civ.P. 51. The district court also specifically asked

counsel for Kaiser whether he objected to the plaintiffs' legal basis for seeking damages for diminution of going concern value, and Kaiser's counsel raised no objection to the submission of the issue to the jury. App. at 7529–7531.[4]

By granting Kaiser's motion for JNOV, the district court effectively repudiated its own jury instructions even though Kaiser had not challenged the legality of the plaintiffs' damages theory. Having properly submitted the issue to the jury, it was error to rule on a JNOV that the plaintiffs, as a matter of law, could not recover for diminution of going concern value on the ground that Columbia had not actually liquidated on the date used for the damages calculation.

We conclude that Kaiser failed to preserve for JNOV consideration the ground relied upon by the district court to grant the JNOV, and that the district court incorrectly decided that the jury determination was erroneous. To the extent that the district court's order granted the motion for a JNOV, it will be reversed.

## X. Conclusion

The order of the district court granting in part the defendant's motion for a JNOV will be reversed. The judgment entered by the district court on January 18, 1983 will be vacated and the judgment entered on December 4, 1981 will be reinstated, and that judgment will be affirmed.

Statement of ADAMS, Circuit Judge, sur denial of the petition for rehearing in banc.

I respectfully dissent from the order denying rehearing in banc, because I believe that this case raises a number of issues of sufficient import to command the attention of the entire Court.

First, I believe there is a serious question whether Kaiser's contentions regarding the applicability of the Supreme Court's recent decision in *Copperweld Corp. v. Indepen-*

---

**4.** For example, the plaintiffs submitted a proposed jury instruction which stated, *inter alia,* "An antitrust plaintiff may recover both lost profits and the value of the business as a going concern as of the date the business terminated or made effectively dormant by the actions of defendants." App. at 5601. Kaiser's counsel, when asked by the district court if he had any objections to the instruction replied, "I don't really have an objection to the description of what the plaintiff is seeking to do here, your Honor. It is just the way this is phrased. It is not really an objection to the concept of the charge." App. at 7531.

*dent Tube Co.,* —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), have been properly answered. Copperweld, handed down after the trial but before the decision of the panel, holds that a parent and a wholly-owned subsidiary are not considered separate entities for purposes of a conspiracy charge under section 1 of the Sherman Act, 15 U.S.C. § 1. If there can be no intra-enterprise conspiracy under section 1 of the Sherman Act, Kaiser asserts that logic dictates a similar result under section 2 of the Sherman Act. If Kaiser is correct, then the propriety of the jury's verdict which relied in part on such a conspiracy is called into question.

Second, the bifurcation of the trial resulting in different juries determining liability and damages raises serious questions under the standard set forth by the Supreme Court in *Gasoline Products Co., Inc. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). This Court has recently recognized the continued vitality of *Gasoline Products* —that retrial of only one issue in a case, such as liability, is not proper unless "it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Id.* at 500, 51 S.Ct. at 515. In *Stanton by Brooks v. Astra Pharmaceutical Products, Inc.,* 718 F.2d 553, 576 (3d Cir.1983), this Court emphasized the danger of separate trials on damages and liability, particularly when there is evidence, as here, that the first jury reached a compromise verdict. This is illustrated by the fact that the first jury here returned a damage verdict of $5,445,-000 when trebled and the second jury returned a verdict of $9,567,939 when trebled.

Finally, the substantial expansion of the "price squeeze" theory of liability also merits attention. Kaiser has been found guilty of utilizing an unlawful price squeeze even though during the years in question plaintiff was purchasing its raw materials from Alcoa and Reynolds, rather than from the defendant. One essential element of a price squeeze is monopoly power in the raw material. *See United States v. Aluminum Company of America,* 148 F.2d 416 (2d Cir.1945). Therefore, it appears to be a significant extension of the price squeeze doctrine to predicate antitrust liability on such a basis in a case in which the defendant is not selling the raw material in question to the plaintiff and there is no evidence of any conspiracy between defendant and the other suppliers of the raw material.

Each of these important issues would appear to warrant further attention by the entire Court.