

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-1999

# Hopp v City of Pittsburgh

Precedential or Non-Precedential:

Docket 98-3411

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Hopp v City of Pittsburgh" (1999). *1999 Decisions.* Paper 282.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/282

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 14, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 98-3411, 98-3427

MICHAEL HOPP; LAWRENCE T. SKINGER;
CHARLES S. KNOX; BRIAN E. DAYTON; MARK JOYCE;
HARRY R. LUTTON; JOHN E. SHAMLIN

v.

THE CITY OF PITTSBURGH;
THE CIVIL SERVICE COMMISSION OF THE
CITY OF PITTSBURGH

(D.C. Civil No. 93-00351)

ROBERT T. GROSS; DONALD J. HAMLIN;
MICHAEL HOPP; JOSEPH M. DINNIEN

v.

THE CITY OF PITTBURGH

(D.C. Civil No. 93-01009)

The City of Pittsburgh; The Civil Service Commission of
the City of Pittsburgh,

        Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(District Court Civil Nos. 93-00351, 93-01009)
District Judge: The Honorable Maurice B. Cohill, Jr.

Argued: May 27, 1999

Before: GREENBERG and ALITO, Circuit Judges,
and DOWD, District Judge*

(Opinion Filed: October 14, 1999)

Jaqueline R. Morrow
Randall C. Marshall (argued)
City of Pittsburgh
Department of Law
313 City County Building
Pittsburgh PA 15219
 Attorneys for Appellants

Samuel J. Cordes (argued)
Ogg, Jones, Cordes & Ignelzi
245 Fort Pitt Blvd.
Pittsburgh PA 15222
 Attorney for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Nine police officers brought this employment discrimination action against the City of Pittsburgh. The jury returned a verdict in favor of the plaintiffs, and judgment was entered accordingly. For the reasons explained below, we affirm.

I.

A. In 1992, the City of Pittsburgh (the "City") offered an early retirement incentive to its police officers. This incentive permitted any officer who was 50 years old and had completed 25 years of service to retire with a monthly pension benefit equal to 75% of his or her average monthly

_____

*The Honorable David D. Dowd, Jr., United States District Court for the Northern District of Ohio, sitting by designation.

2

pay, if the employee retired by December 31, 1995. Nearly 50% of the City's police force qualified for the benefit.

Recognizing that the usual process of selecting police officers took well over a year, the City began to develop plans to replace the large number of experienced police officers that it was about to lose to early retirement. To that end, the City enacted an ordinance--which later became known as "Ordinance 26"--that authorized the City to hire certified, experienced police officers without following the procedures outlined in Pennsylvania's General Civil Service Statute, 53 Pa.C.S.A. S 23431 et seq., or the Policemen's Civil Service Statute, 53 Pa.C.S.A. S 23531 et seq. Perhaps most significantly, Ordinance 26 authorized the City to hire experienced police officers without ranking applicants on eligibility lists through civil service testing.

The Fraternal Order of Police challenged the validity of Ordinance 26 in the Court of Common Pleas of Allegheny County, arguing that it violated Pennsylvania law. Fraternal Order of Police v. City of Pittsburgh, 644 A.2d 246 (Pa. Commw. Ct. 1994). The court agreed and issued an order enjoining the City from hiring certified police officers under Ordinance 26 unless those officers were ranked after competitive testing.

Although the City appealed this order and ultimately prevailed on appeal, it had an urgent need to hire experienced police officers to replace the retiring officers. Rather than waiting for the appeal to be resolved, the City complied with the order and administered a written examination to all of the officers who had applied for positions under the provisions of Ordinance 26.

The City, however, was concerned that ranking applicants according to their performance on a written examination, as required by the court order, might unfairly prejudice African-American applicants. In response to this concern, the mayor and the city council adopted a new hiring procedure designed to give the City "greater flexibility in creating a police force that reflect's (sic) our overall population." App. at 1113.

The new hiring procedure, like the one it replaced, required applicants to take a written examination. As

3

before, the City ranked applicants according to their performance on the written examination and anticipated extending offers of employment according to each applicant's rank. The new procedure, however, added a new component to the application process; it required applicants to take an oral examination.

The oral examinations were administered by various three-member panels appointed by the Police Bureau of the City's Department of Public Safety. The oral examination panels scored each applicant on a pass/fail basis. Any applicant could be eliminated from consideration, regardless of his or her performance on the written examination, if the panel determined that the applicant "failed" the oral examination. The oral examination panels did not ask a pre-determined series of questions, or even follow a routine set of procedures, in administering the exam.1 In effect, therefore, each panel had complete and unreviewable discretion to decide who, among the otherwise-qualified applicants, would become eligible to receive offers of employment from the City.

Applicants who passed both examinations were considered "certified" for employment as police officers. Their names, along with information about their written examination ranking, race, and gender, were then presented to the City's Director of Public Safety. The Director of Public Safety hired applicants according to rank. However, the Director had complete discretion to "undercut" any applicant who had been certified for employment, regardless of that applicant's rank.

B. The plaintiffs are nine white police officers  who performed well on the written examination but were denied employment after failing the oral examination. They brought this action pursuant to 42 U.S.C. SS 1981 and 1983, alleging that the City had discriminated against them on the basis of race. Specifically, they alleged that the City

_____

1. The panel members evaluated each applicant on the basis of five personal attributes: "speaking," "interpersonal relations," "problem sensing and solving," "motivation," "listening," and "overall suitability."
See App. at 198-207.

4

had used its new hiring procedure, and particularly the oral examination, to discriminate against white applicants.

Several weeks before trial, the City filed a motion for summary judgment, arguing that the plaintiffs had insufficient evidence to prove that they had been subjected to racial discrimination. The District Court denied that motion. The Court concluded that the plaintiffs had made out a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and the Court stated that the City had not "put forth evidence of a legitimate, non-discriminatory reason for the failure to hire, or why the plaintiffs failed the oral portion of the test." 6/1/98 Tr. at 3. In addition, the Court stated that there was"sufficient evidence that the proffered reasons [were] a pretext." Id.

During the jury selection process, the City questioned why the plaintiffs used one of their peremptory challenges against an African-American on the jury panel. After considering the reasons offered by plaintiffs for striking the potential juror, the District Court concluded that the peremptory challenge was nondiscriminatory. The City made no further objection.

At the conclusion of plaintiffs' case at trial, the City moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50, arguing that the plaintiffs had not introduced sufficient evidence to support their claim of racial discrimination. The City renewed that motion at the close of all of the evidence. The District Court denied the motion in both instances.

During the jury charge conference, the plaintiffs offered-- as a means to simplify the jury instructions--to permit the case to go to the jury using only the liability standard applicable under 42 U.S.C. S 1981. At that time, the City asked the Court to instruct the jury that Pittsburgh could be found liable only if the alleged discrimination was carried out pursuant to a policy, practice, or custom adopted by the City. The District Court denied that request.

Following trial, the jury found that the City had discriminated against each plaintiff on the basis of his race and awarded back pay. The District Court also awarded the plaintiffs prejudgment interest, costs, and attorney fees,

and ordered the City to offer the plaintiffs employment as police officers, contingent upon their successful completion of a physical and psychological examination. In addition, the Court ordered the City to provide front pay until the plaintiffs were either offered employment or failed their physical or psychological examinations. The City appealed.

II.

The City raises five arguments on appeal. We will discuss each in turn.

A. First, the City argues that the judgment should be reversed because the District Court erred in applying the McDonnell Douglas burden-shifting framework. Specifically, the City maintains that because the plaintiffs are white males, the District Court should have required them "to meet a heightened standard in making out a prima facie case."2 Br. for Appellant at 19.

At this juncture, however, the City's argument is foreclosed by United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 713-15 (1983). As the Eleventh Circuit has put it, under Aikens," `[w]hen the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff 's proof by offering evidence of the reason for the plaintiff 's rejection the factfinder must then decide whether the rejection was discriminatory' and the question whether the plaintiff made out a prima facie case is no longer relevant." Tidwell v. Carter Products, 135 F.3d 1422, 1426 n.1 (11th Cir. 1998) (quoting Aikens, 460 U.S. at 714-15); see also J.A. Beaver v. Rayonier, Inc., 1999 WL 709991, at *4 (11th Cir. Sept. 13, 1999).

B. Second, the City argues that the District Court erred in denying the City's Rule 50 motion because the jury's finding of intentional racial discrimination was not supported by the evidence.3 We must affirm unless we find

_____

2. But see Iadimarco v. Runyon, 1999 WL 692709, at *12-17 (3d Cir., Sept. 8, 1999) (rejecting similar argument).

3. The City also argues that the District Court erred in denying its motion for summary judgment. Since the case proceeded to trial, however, our review is limited to the District Court's denial of the City's
Rule 50 motion. See Baughman v. Cooper-Jarrett, Inc., 530 F.2d 529, 533 n.3 (3d Cir. 1976).

6

that the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief. See Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 921 (3d Cir. 1986).

Under the familiar McDonnell Douglas framework, once the plaintiffs were found to have made out a prima facie case, the burden shifted to the City to present evidence of a non-discriminatory reason for the employment decision. See McDonnell Douglas, 411 U.S. at 802; Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). To meet this burden, the City called witnesses who testified that the City did not hire the plaintiffs because, although they were otherwise qualified, they did not pass the oral examination. The City also presented evidence that the oral examination procedure was designed to "minimize, if not eliminate" any "adverse impact" that written examinations might have on African-American applicants. See Br. for Pittsburgh at 31.

Once the City introduced this evidence, the burden of production shifted back to the plaintiffs to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. Here, the plaintiffs presented the following evidence to show that the City's explanation of its hiring decisions was pretextual. They offered evidence showing that the written examination that the City administered prior to 1992 was not culturally biased and was a powerful predictor of job performance. See App. at 730-31, 867, 913. They also presented evidence showing that (1) the City refused to explain why any of the plaintiffs failed the oral examination; (2) the City kept records of each applicant's race throughout the hiring process, see App. at 385, 387, 389, 395, 1116, 1120; (3) the City initially planned to fail 15% of the applicants who made it to the oral examination phase, then raised that number to 35% in an attempt to hire fewer white applicants, see App. at 733-37; (4) the City undercut 29 white applicants who passed all of their examinations, but did not undercut any similarly situated African-American applicants, see App. at

7

1229; and (5) while the City failed many white applicants who performed well on the written examination, it failed very few African-Americans who performed poorly on the written examination, see App. at 1225-28, 1214-17, 147.

Having reviewed the record on appeal, we conclude that a reasonable factfinder could find that the City's explanation of its hiring decisions was pretextual.

C. Third, the City argues that the District Court erred in sending this case to the jury since 42 U.S.C. S 1981 does not provide for a private right of action against municipalities. However, we need not resolve this issue because the City failed to raise it before the jury returned its verdict. To be sure, the City submitted a Rule 50 motion at the close of the plaintiffs' case and later renewed that motion at the close of all of the evidence. See App. at 665-66. But in moving for judgment as a matter of law, the City did not challenge the plaintiffs' right to sue Pittsburgh under 42 U.S.C. S 1981. See id. Accordingly, we conclude that the City waived its right to raise this argument. See Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 814 (3d Cir. 1984) ("If the issue was not raised in the motion for the directed verdict at the close of all the evidence, it is improper to grant the JNOV on that issue.").

D. Fourth, the City argues that the District Court erred in finding that the plaintiffs' decision to exclude juror number 153, an African-American, was not discriminatory. We may not disturb that finding unless we are persuaded that the District Court committed clear error. See Hernandez v. New York, 500 U.S. 352, 353 (1991).

When the City objected to the plaintiffs' decision to exclude juror number 153, the plaintiffs offered a non-discriminatory explanation for their decision, viz., that they had decided to exercise their peremptory strikes against government employees and against individuals who had been involved in discrimination lawsuits. Because juror number 153 was a government employee who had been involved in a discrimination lawsuit, she was a likely candidate for exclusion. The District Court accepted this explanation as non-discriminatory. After this point, the City voiced no further objection.

8

The City now argues that "the race-neutral and facially valid reason" put forward by the plaintiffs "was, as a matter of fact, a mere pretext for actual discriminatory intent." United States v. Umaezhoke, 995 F.2d 388, 392 (3d Cir. 1994); see Br. for Appellants at 53. In support of that argument, the City points out that the plaintiffs did not strike juror number 200, a government employee, but instead struck juror number 22, who was not a government employee and had not been involved in a discrimination lawsuit, simply because plaintiffs' counsel "just didn't like [her]." App. at 306; see also Br. for Appellants at 53. This apparent inconsistency, the City argues, shows that the plaintiffs' explanation for their decision to strike juror number 153 was pretextual.

We are not persuaded that the plaintiffs' failure to strike juror number 200 (the government employee) instead of juror number 153 is sufficient to show that the District Court's finding was clearly erroneous. An attorney with a general plan to strike jurors who have a certain characteristic (such as jurors who are government employees or jurors with prior involvement in a discrimination suit) may decide, as the attorney's peremptory challenges dwindle, that it is more important to strike a juror who lacks this characteristic but who seems unappealing for some other, more compelling reason. On the record before us, we cannot find clear error.

E. Finally, the City argues that the District Cour t erred in instructing the jury on the issue of municipal liability. The issue of whether a jury instruction misstates the proper legal standard is subject to plenary review. See Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996). We need not reverse, however, if we conclude that "the jury would have reached the same result had it been instructed according to the correct legal standard." Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 156 (3d Cir. 1998).

The City argues that the District Court's municipal liability instruction disregarded the principles set out in Monell v. New York City Department of Social Services, 436 U.S. 658 (1978). In Monell, the Supreme Court held that in actions brought pursuant to 42 U.S.C. S 1983,

9

municipalities cannot be held liable under the doctrine of respondeat superior but may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694.

In subsequent cases, the Supreme Court explained that "identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury." Jett v. Dallas Indep. School District, 491 U.S. 701, 737 (1989). However,"[o]nce those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom . . . ." Id . (internal citations omitted).

During the jury charge conference in this case, the City asked the District Court to instruct the jury that the City could not be held liable unless the discriminatory action resulted from to an official policy, custom, or practice of the City. See App. at 977–80. The District Court denied the City's request and instructed the jury as follows:

> When a City government is involved, of course, it may act only through natural persons as its agents or employees. And, in general, any agent or employee of the City may bind the City by his acts and declarations made while acting within the scope of his authority delegated to him by the City, or within the scope of his duties as an employee of the City.

App. at 1068 (emphasis added).

In light of Monell and its progeny, this instruction was erroneous because it suggested that the City could be held liable under the doctrine of respondeat superior and therefore failed to inform the jury that the City could be held liable for the oral examination panels' decisions only if the city "caused the deprivation of rights at issue by policies which affirmatively command that it occur." Jett,

10

491 U.S. at 737. Nevertheless, the plaintiffs argue that the error was harmless since the City never contested the plaintiffs' allegation that the oral examination panels made hiring decisions according to policies adopted by the City.4 This approach by the City, the plaintiffs argue, rendered the instruction harmless.

We agree. This was not a case in which the plaintiffs had strong evidence that a lower level municipal employee had committed a constitutional violation, and the municipality contended that the employee's actions did not result from any municipal policy or custom. Rather, this was a case in which the plaintiffs focused directly on the City's policies, argued that those policies were designed to produce discrimination, and asked the jury to infer that the oral examination panels whose decisions are at issue followed the City's allegedly discriminatory policies. See, e.g., App. at 1017–64 (plaintiffs' closing argument). The City contested only the plaintiffs' allegation that the City's hiring policies were discriminatory; it never argued that the oral examination panels departed from those policies. See, e.g., App. at 1015 (defendants' closing argument) ("[This case is about the City designing and implementing a system that tries to select the best qualified applicants . . . ."); see also Memorandum in Support of Defendants' Motion for Summary Judgment, App. at 70 (referring to the hiring procedures at issue as "the City of Pittsburgh's custom, practice, and/or policy").

For these reasons, it is apparent that the District Court's municipal liability instruction, although erroneous, could not have affected the outcome of this case. See Murray, 145 F.3d at 156 ("[W]e will not reverse a judgment where `it is highly probable that the error did not contribute to the

_____

4. The plaintiffs actually raised this argument during the jury charge conference. They suggested that the instruction proposed by the City was not necessary since the City had never argued that the oral examination panels' decisions were contrary to the City's official policies, customs, or practices. See App. at 979 ("It would just be our position in this kind of case, where it's clearly a person was either fired or not by someone with the authority, final authority of the City to do it [sic]. It makes no practical difference [whether the Court gives such an instruction here].").

11

judgment.' ") (quoting McQueeney v. Wilmington Trust Co., 779 F.2d 916, 924 (3d Cir. 1985)); see also 11 Charles Alan Wright et al., Federal Practice and Procedure S 2886, at 467-70 (2d ed. 1995) ("Errors in instructions routinely are ignored if . . . [it] is apparent that the error could not have changed the result."). Accordingly, we conclude that the District Court's error was harmless.

III.

For the foregoing reasons, we affirm.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit